IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| DFW DANCE FLOORS, LLC D/B/A CENTER STAGE FLOORS,<br><br>　Plaintiff,<br><br>v.<br><br>BENJAMIN SUCHIL, AND IMPERIAL FLOORS, LLC,<br><br>　Defendant. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff DFW Dance Floors, LLC d/b/a Center Stage Floors ("Plaintiff" or "Center Stage") files this Original Complaint against Defendants Benjamin Suchil ("Suchil") and Imperial Floors, LLC ("Imperial Floors") (collectively, "Defendants").

### I.   INTRODUCTION

1.   Center Stage offers novel dance floors for luxury events. Chris Soiset ("Soiset"), Center Stage's owner, conceived of and designed the floors and the process for constructing the floors in his garage with funding from a second mortgage on his home. Suchil, a high school graduate with no previous flooring or events experience, was Center Stage's former Operations Manager until April 2021 when he quit along with most of Center Stage's staff. Prior to quitting, Suchil began a competing company, Imperial Floors, using Center Stage's trade secrets. To lure Center Stage's clients to Imperial Floors, Suchil created chaos and panic amongst Center Stage's clients while he fraudulently tried to purchase Center Stage. Center Stage later learned that five months before he quit, Suchil pleaded guilty to a felony for injury to a child 14 years or younger and agreed to five years of probation with restrictions on his movements that were detrimental to his position as Operations Manager at Center Stage and the safety of Center Stage's clients.

## II.    THE PARTIES

2. Plaintiff DFW Dance Floors, LLC d/b/a Center Stage Floors is a Texas limited liability company with its principal place of business in Dallas County, Texas.

3. Defendant Benjamin Suchil is an individual residing in Dallas County, Texas and may be served with process at 1818 Ramsgate Rd, Forney, TX 75126, or wherever he may be found.

4. Defendant Imperial Floors, LLC is a limited liability company with its principal place of business in Dallas County, Texas, and may be served with process by serving its registered agent, United States Corporation Agents, Inc. at 9900 Spectrum Drive, Austin, TX 78717, or wherever it may be found.

## III.    JURISDICTION AND VENUE

5. This Court has original jurisdiction over this lawsuit pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. and 28 U.S.C. § 1331.

6. This Court has personal jurisdiction over Defendants because they reside and are licensed to do business and, in fact, do substantial business in Texas.

7. The Northern District of Texas is a proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants Suchil and Imperial Floors reside, and a substantial part of the events or omissions giving rise the claims occurred, in this judicial district.

## IV.    FACTUAL BACKGROUND

**A.    Center Stage dominated the specialty dance floor market with its uniquely engineered floor panels and reliable service.**

8. In 2010, Soiset, a licensed engineer with a civil engineering degree from North Carolina State University, began operations as a dance floor rental company using commercially

available floor panels. He worked very hard to provide the best dance floors he could, researching methods, equipment, and materials to make the panels look as good as possible.

9. Three years later, Soiset concluded that he could not overcome the inherent limitations of the commercially available dance floor panels and spent months designing and developing his own product in his garage. He took out a second mortgage on his home to develop the new product.

10. Soiset's design is unique in that it uses "blank" dance floor panels that allow an infinite variety of dance floor looks, including glittery and smokey, to give a customized luxury look to any event. Once assembled by Center Stage, the panels form a seamless dance floor. The photos below show a commercially-available dance floor (left) and a Center Stage custom-designed, seamless flooring (right):



11. Soiset also designed a unique process of applying customized surfaces to blank panels, using a specially designed tool, and connecting the floor panels without exposing any unsightly connectors. While the dance floors can withstand heavy traffic and moisture, the surfaces of the panels are replaceable and recyclable when they are worn. These features allow Center Stage

3

to efficiently offer unique and custom designs for each event. In addition, Soiset designed a method of customizing the trims on the panels, so that clients could change the colors of the trim to complement the design on the floor panels. Soiset's design and implementation process was novel and no other company offered his unique product and services at that time.

12. In July 2013, Soiset rolled out the first generation of his new dance floor design and started Center Stage. Center Stage quickly gained a solid reputation for providing the best-looking dance floors in the area, and his business grew considerably. Center Stage has continued to improve its products, including its unique dance floors, and now offers the fifth generation of Soiset's flooring design. Soiset has also applied his design and methods to stages, platforms, bar facades, backdrops and freestanding walls, so that Center Stage can offer its clients the decorative detail, including color and finish, they desire.

13. Center Stage's unique dance floors propelled it to success, consuming the entire Dallas-Fort Worth market, and creating tremendous demand for its beautiful dance floors. Center Stage was also commissioned to provide its specialty dance floors to other cities around the country because no other company offered comparable products. Wedding and event planners in other cities have requested that Center Stage open branches in their cities. A sales representative from at least one dance floor manufacturer stated that they hoped Center Stage never decided to sell its dance floors because the manufacturer would "be knocked out of the game."

14. Understanding the value of its unique dance floor design and methods, Center Stage diligently works to protect the design of the dance floors and the processes of connecting and customizing them. It maintains information related to designs, suppliers, processes, and materials on password-protected computers. The information is not available to anyone outside of Center

Stage. In addition, all equipment, inventory, and materials are kept in a locked warehouse with an installed security and monitoring system.

15. In addition to the competitive advantage bestowed by its novel dance floors, Center Stage is also successful because it has built a reputation of being responsive, reliable, and dependable–all traits that are particularly necessary in the stressful wedding industry. Weddings are extremely demanding events because they are, hopefully, a-once-in-a-lifetime display of the bride and groom's love that requires picture-perfect designs, with to-the-minute execution. Wedding planners will not use a vendor that they cannot depend upon to deliver quality services on time. Center Stage built a name that wedding planners trusted to provide its products on time with impeccable service.

**B.    Suchil was a key Center Stage employee with access to Center Stage's confidential trade secrets.**

16. In or around early 2014, Center Stage hired Ben Suchil, a high school graduate with no previous flooring or wedding experience, giving him access to Center Stage's confidential business information. Center Stage and Suchil's employment relationship created a duty, which obligated Suchil to refrain from using Center Stage's confidential or proprietary information acquired during the relationship in a manner adverse to Center Stage. This information included trade secrets like client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels.

17. In or around August 2018, Center Stage promoted Suchil to Operations Manager, making him a key employee. As Operations Manager, Suchil hired and fired employees, set employee pay and hours, communicated with clients, obtained quotes for jobs, and managed job deliveries and the calendar.

18. Suchil's position as Operations Manager created a fiduciary duty to not compete with Center Stage while employed and to maintain the confidentiality of Center Stage's proprietary trade secrets. No other employee held a formal manager role with Center Stage.

19. Upon his hiring, Center Stage explained to Suchil, as it did all other employees, that Center Stage's trade secrets, including client and product information, must remain confidential. Center Stage also took active steps to protect its trade secrets, including password protecting Center Stage's computer, electronic mail, and QuickBooks systems, and disseminating its confidential and proprietary information only on a need-to-know basis. Center Stage derives independent economic value from the fact that its trade secrets are not generally known to those outside of Center Stage.

C. **While employed by Center Stage, Suchil planned to compete with Center Stage.**

20. On or about February 21, 2022, at approximately 11:30 am, Suchil asked Soiset to meet him in Center Stage's fabrication room. There, Suchil offered to buy Center Stage for $2.4 million but wanted Soiset to stay on at $60,000 per year as an employee. Considering his own retirement, Soiset began negotiating the sale of Center Stage to Suchil in good faith.

21. When negotiations did not proceed as he planned, Suchil then asked if he could buy just the floor panels in order to start his own business. Soiset rejected Suchil's request because, as Soiset had previously informed Suchil, the floor panels are proprietary and selling them to a local competitor would harm Center Stage's business.

D. **In an effort to obtain the novel floor panels at a deep discount, Suchil tried to destroy Center Stage's reputation and extort Center Stage's assets.**

22. On April 18, 2022, all of Center Stage's employees, except its salesperson, resigned in unison. Stunned by the loss of most of his employees, Soiset quietly began working to rebuild Center Stage's staff in preparation for the weekend's jobs.

23. Suchil told Soiset that he had already emailed Center Stage's clients and had six flooring jobs lined up for May and June 2022. Presumably, Suchil intended to use Center Stage's now ex-employees to perform those jobs.

24. On April 20, 2022, taking advantage of Soiset's precarious situation, Suchil told Soiset that he and the now ex-employees would cover Center Stage's jobs that weekend if Soiset sold Center Stage to Suchil. At risk of defaulting on all of the jobs scheduled for that weekend and the next–because most of Center Stage's employees quit two days prior with Suchil–Soiset met with Suchil at Center Stage to discuss a possible sale of the business to Suchil. Suchil told Soiset that he had already received "double-digit" responses from Center Stage clients that wanted to work with Suchil after he left Center Stage.

25. Suchil offered a Purchase of Business Agreement ("Agreement") for Soiset's signature. Soiset reviewed the Agreement and the two negotiated a deal wherein Suchil would purchase Center Stage's assets for $1.5 million. After negotiations, Soiset accepted Suchil's final terms and signed the Agreement. *See* Exhibit 1 (Purchase of Business Agreement, signed on April 20, 2022). Suchil then ratified the Agreement when he began to act as the new owner of Center Stage by reviewing Center Stage's bank and QuickBooks accounts and bringing back the ex-employees to work at Center Stage.

26. After Suchil reviewed Center Stage's bank accounts and learned that he would not receive as much cash as he expected,[1] he tried to renegotiate the already binding Agreement and buy Center Stage for $1 million instead. Soiset rejected this offer to renegotiate the binding Agreement.

---

[1] Suchil stated that he expected at least $400,000 in Center Stage's bank accounts.

27. Then, Suchil tried to change the terms of the binding Agreement again to a deal where Suchil and Center Stage's ex-employees would perform two weeks of jobs for Center Stage, in exchange for Center Stage's inventory, including floor panels and trucks. Soiset rejected that deal. Suchil threatened Soiset that Soiset would "get the shit sued out of [him] for failing to deliver on all the events that weekend and the next." Around this time, Soiset learned that Suchil had already caused panic amongst Center Stage's clients. One client, who Soiset had not told about the mass resignation, sent a threatening and panicked text to both Suchil and Soiset:



28. Considering that Suchil bragged earlier in the day about his "double-digit" responses from Center Stage clients, it became abundantly clear that Suchil was extorting Center Stage for his own gain by destroying Center Stage's reputation and brand within the wedding and events industries.

29. The next morning, April 21, 2022, Suchil offered to perform only one week of jobs for Center Stage in exchange for just the inventory–no trucks. Suchil brought eight to ten of Center Stage's ex-employees with him as a reminder to Soiset that Suchil held Center Stage's upcoming jobs hostage. Without the employees, Center Stage would have a difficult time performing its upcoming jobs. Soiset rejected that deal too.

30. Suchil then abandoned the Agreement and Center Stage. Center Stage's ex-employees now would not return to work at Center Stage.

31. Without employees to perform the work, Soiset scrambled, with less than one day to prepare, to get a new team to perform the contracted jobs that weekend. Had Suchil not fraudulently pretended to purchase Center Stage, Soiset would have had more time to prepare the staff for the weekend jobs, not less than one day. In addition, Suchil's fraudulent maneuvering allowed the news of the chaos and uncertainty at Center Stage to spread through the wedding and events industries, which caused irreparable damage to Center Stage.

32. Suchil's planned sabotaging of his eight-year employer that gave him, without an education or experience, a chance and promoted him to operations manager, caused irreparable damage to Center Stage's operations, reputation, and brand.

E. **Suchil never planned to purchase Center Stage, and instead incited chaos to pave the way for his new company, Imperial Floors, to compete with Center Stage.**

33. Suchil's timing, with the mass resignation and the immediacy of Center Stage's need to ensure that it was staffed for upcoming jobs, caused considerable injury to Center Stage.

9

However, nothing compared to Soiset's shock when he later learned of the extent of Suchil's plan to compete with Center Stage while Suchil was still employed by Center Stage.

34. First, Soiset learned that on March 15, 2022, while still employed by Center Stage, Suchil formed a competing business, Imperial Floors. Suchil did not disclose his competing business to Soiset while he was still employed by Center Stage.

35. Soiset also learned that, despite Suchil's representations, while Suchil presented, negotiated, entered, and ratified the Agreement, Suchil did not have the capability of purchasing Center Stage for $1.5 million. If Soiset knew this, he would not have wasted valuable time negotiating with Suchil and jeopardizing his immediate jobs. Instead, Soiset would have immediately put a new team in place in preparation for the weekend's jobs, with no interruption and no harm to Center Stage's clients.

36. Next, Soiset learned that Suchil took Center Stage's quotes and client lists so that his new company, Imperial Floors, could now compete with Center Stage. A picture of a dance floor for a job in June 2022 that Suchil quoted, while still employed by Center Stage, appears prominently on Imperial Floors' website. In addition, many wedding planners, whom Suchil could have only met while providing flooring services for Center Stage, reported that Suchil contacted them after he left Center Stage to get business for Imperial Floors. *See*, *e.g.*, Exhibit 2 (email from Suchil to one of Center Stage's clients trying to get business for Imperial Floors). Suchil blatantly stated in his email to Center Stage's client that he had left Center Stage, formed Imperial Floors LLC, and hoped to continue his working relationship with Center Stage's clients, but on behalf of Imperial Floors. Suchil obtained that client's unpublished Gmail address during his work as a key employee at Center Stage.

10

37. Finally, and most disturbingly, Soiset learned that on or about November 17, 2021, Suchil was charged with a third-degree felony against a child fourteen years old or younger, pleaded guilty to intentional injury of a child, and was sentenced to five years of probation on December 1, 2021. *See State of Texas vs. Benjamin Suchil*, Criminal District Court #3 in Dallas, County, Texas, Cause No. 21-00572. Suchil's probation requires him to (1) remain in Kaufman County, Texas, unless he obtains written approval to leave, (2) work faithfully at his employment, (3) not possess or consume alcoholic beverages, and (4) not have unsupervised contact with minor children, except his own. *See* Exhibit 3 (Suchil's Agreed Plea of Guilty).

38. Suchil's probation restrictions severely interfere with his job managing events. First, it is not clear that Suchil obtained/obtains written approval to provide onsite supervision to the weddings and other events outside Kaufman County. Second, Suchil's sabotage and extortion of Center Stage is not faithful work as required by his probation. Next, it is problematic for a bride and groom to have a worker, who cannot possess or consume alcohol, at their wedding where alcohol is served. Similarly, and most important, it is dangerous for Suchil to be at events, like weddings, where minor children may be present. Ultimately, the bride and groom risk police interrupting their wedding if there is a room flip requiring Suchil's presence because of Suchil's probation violations. Suchil never informed Soiset of his probation despite the fact that these restrictions greatly affected Suchil's availability for jobs performed at Center Stage and the safety of Center Stage's clients. Moreover, Soiset would have never considered selling Center Stage to Suchil if Soiset knew the details of Suchil's criminal charge and probation.

## V. CAUSES OF ACTION

**A. First Cause of Action: Breach of Fiduciary Duty against Suchil**

39. As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

11

40. An informal fiduciary relationship, which generally encompasses good faith, fair dealing, integrity, and fidelity, may arise between an employee and employer. When such a fiduciary relationship exists, the employee has a duty to act primarily for the benefit of the employer in matters connected with his employment. While an employee retains the right to prepare to compete with his or her employer, Texas law prohibits an employee from appropriating trade secrets from his employer and carrying away confidential information, including client lists.

41. During the period of his employment with Center Stage, Suchil had an obligation to refrain from appropriating Center Stage's trade secrets and carrying away Center Stage's client information to compete against Center Stage. These restrictions protect Center Stage's legitimate business interests, including its confidential information, goodwill among clients, and protected business relationships. Suchil breached his fiduciary duty by using Center Stage's confidential and proprietary information to solicit Center Stage's clients to compete with Center Stage. *See*, *e.g.*, Exhibit 2.

42. Suchil also breached his fiduciary duty by not informing Center Stage of his criminal probation and its restrictions, which potentially subjected Center Stage to liability and risked interrupting Center Stage's operations.

43. Center Stage has suffered and will continue to suffer damages and irreparable harm as a result of Suchil's breach of this duty, including loss of its business and contractual relationships, diminished value of its confidential information, harm to its goodwill and reputation, and loss of its employees.

44. As a direct and proximate result of the unlawful, malicious, wrongful, and fraudulent conduct on the part of Suchil, Center Stage was injured, continues to suffer actual damages, and is entitled to exemplary damages.

45. Center Stage cannot be adequately compensated through remedies at law alone, and thus requires equitable relief in addition to compensatory and punitive relief.

46. The actions of Suchil will continue to cause damages and irreparable harm to Center Stage if not restrained.

**B.** **Second Cause of Action: Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against Suchil and Imperial Floors.**

47. As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

48. Center Stage's confidential, proprietary, and trade secret information relates to products used in, or intended for use in, interstate or foreign commerce.

49. As described above, Center Stage alleges that Suchil retained, after his employment ended and in violation of his common law fiduciary duty, Center Stage's trade secrets as that term is defined in 18 U.S.C. § 1839(3). The trade secrets include information regarding Center Stage's client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels. Center Stage took reasonable measures to keep its proprietary and confidential information secret. These measures consist of physical and/or technological safeguards, including storing information on password-protected software and computers, and controlling who has access to the information. This information derives economic value for Center Stage from not being generally known to, and not being readily ascertainable through proper means by another person or company that can obtain economic value from the disclosure or use of the information.

50. Center Stage has expended significant money and effort developing its products, methods, and systems, and the information would be difficult to properly acquire or duplicate by any of Center Stage's competitors.

51. Center Stage alleges that Suchil and Imperial Floors misappropriated Center Stage's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets. Specifically, Suchil and Imperial Floors acquired, disclosed, and used Center Stage's trade secrets by breaching or inducing a breach of Suchil's common law fiduciary duty to Center Stage to maintain secrecy. In addition, at the time they used or disclosed Center Stage's trade secrets, Suchil and Imperial Floors knew or had reason to know that their knowledge of Center Stage's trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of Center Stage's trade secrets or limit their use, or was derived from or through persons who owed a duty to Center Stage to maintain secrecy of Center Stage's trade secrets or limit their use, in violation of 18 U.S.C. § 1839(5)(A)–(B).

52. Suchil disclosed Center Stage's trade secrets to Imperial Floors and both Suchil and Imperial Floors used the misappropriated trade secrets to compete with Center Stage with Center Stage's clients. For example, on May 1, 2022, Suchil contacted Center Stage's client to solicit business for Imperial Floors. *See* Exhibit 2. Suchil obtained that client's unpublished Gmail address during his work at Center Stage. Upon information and belief, Suchil and Imperial Floors continue to use the misappropriated trade secrets by soliciting business from clients of Center Stage.

53. Suchil and Imperial Floors have gained an improper competitive advantage over Center Stage that has caused or may cause Center Stage to lose out on business that it would have otherwise obtained. Their conduct, and their ongoing and continuing use of the trade secrets and proprietary and confidential information of Center Stage, has caused, and will cause, Center Stage repeated and irreparable injury. Center Stage's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Suchil and Imperial Floors.

54.     As remedies for Suchil and Imperial Floor's misappropriation of its trade secrets, Center Stage seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by 18 U.S.C. § 1836(b)(3)(B)(i). As an alternative to lost profits, Center Stage seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Suchil's and Imperial Floor's unauthorized disclosure and use of the trade secret, as authorized by 18 U.S.C. § 1836(b)(3)(B)(ii). Given the willful and malicious nature of Suchil's misappropriation, Center Stage also seeks attorneys' fees and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

C.  **Third Cause of Action: Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code Ann. § 134A.002, et. seq. against Suchil and Imperial Floors.**

55.     As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

56.     As described above, Center Stage alleges that Suchil retained, after his employment ended and in violation of his common law fiduciary duty, Center Stage's trade secrets as that term is defined in Section 134A.002(6) of the Texas Civil Practices and Remedies Code. The trade secrets include information regarding Center Stage's client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels. Center Stage took reasonable measures to keep its proprietary and confidential information secret. These measures consist of physical and/or technological safeguards, including storing information on password-protected software and computers, and controlling who has access to the information. This information derives economic value for Center Stage from not being generally known to, and not being readily

ascertainable through proper means by another person or company that can obtain economic value from the disclosure or use of the information.

57.     Center Stage has expended significant money and effort developing its products, methods, and systems, and the information would be difficult to properly acquire or duplicate by any of Center Stage's competitors.

58.     Center Stage alleges that Suchil and Imperial Floors misappropriated Center Stage's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets. Specifically, Suchil and Imperial Floors acquired, disclosed, and used Center Stage's trade secrets by breaching or inducing a breach of Suchil's common law fiduciary duty to Center Stage to maintain secrecy. In addition, at the time it used or disclosed Center Stage's trade secrets, Suchil and Imperial Floors knew or had reason to know that their knowledge of Center Stage's trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of Center Stage's trade secrets or limit their use, or was derived from or through persons who owed a duty to Center Stage to maintain secrecy of Center Stage's trade secrets or limit their use, in violation of TUTSA, §§ 134A.002, 134A.003.

59.     Suchil disclosed Center Stage's trade secrets to Imperial Floors and both Suchil and Imperial Floors used the misappropriated trade secrets to compete with Center Stage with Center Stage's clients. For example, on May 1, 2022, Suchil contacted Center Stage's client to solicit business for Imperial Floors. *See* Exhibit 2. Suchil obtained that client's unpublished Gmail address during his work at Center Stage. Upon information and belief, Suchil and Imperial Floors continue to use the misappropriated trade secrets by soliciting business from clients of Center Stage.

60.     Suchil and Imperial Floors have gained an improper competitive advantage over Center Stage that has caused or may cause Center Stage to lose out on business that it would have otherwise obtained. Their conduct, and their ongoing and continuing use of the trade secrets and proprietary and confidential information of Center Stage, has caused, and will cause, Center Stage repeated and irreparable injury. Center Stage's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Suchil and Imperial Floors.

61.     As remedies for Suchil and Imperial Floor's misappropriation of its trade secrets, Center Stage seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by TUTSA, § 134A.004. As an alternative to lost profits, Center Stage seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Suchil's and Imperial Floor's unauthorized disclosure and use of the trade secret, as authorized by TUTSA, § 134A.004. Given the willful and malicious nature of Suchil's misappropriation, Center Stage also seeks attorneys' fees and exemplary damages pursuant to TUTSA, §§ 134A.002, 134A.003.

**D.     Fourth Cause of Action: Fraud against Suchil**

62.     As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

63.     As described above, on or about April 20, 2022 at Center Stage's office, while Suchil was pretending to purchase Center Stage in an effort to create chaos and confusion amongst Center Stage's clients, Suchil failed to disclose material facts to Soiset. Suchil did not have the means to purchase Center Stage, and had been sentenced to probation five months prior, restricting his ability to travel outside of Kaufman County and his presence around children and alcohol. Suchil misrepresented and omitted these material facts with the intention of defrauding Center

Stage so that he could build his competing business. Center Stage relied on Suchil's misrepresentations and omissions to its detriment, causing Center Stage injury.

64. As a direct and proximate result of the unlawful, malicious, wrongful, and fraudulent conduct on the part of Suchil, Center Stage has been injured and has suffered actual damages, and Center Stage is entitled to exemplary damages

E. **Fifth Cause of Action: Breach of Contract against Suchil**

65. As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

66. As described above, on April 20, 2022, Suchil offered the Agreement to purchase Center Stage for Soiset's signature. Eventually, Soiset agreed to Suchil's final offer and signed the Agreement, creating a binding and enforceable contract, which Suchil ratified. *See* Exhibit 1. Suchil then abandoned the Agreement, breaching its terms.

67. As a result of Suchil's breach of the Agreement, Center Stage has been injured and has suffered consequential damages and Center Stage seeks such damages and attorney fees as a result.

## VI.     JURY DEMAND

68. Center Stage demands a trial by jury.

## VII.    PERMANENT INJUNCTION

69. As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

70. Unless Suchil and Imperial Floors are permanently enjoined, they will continue to profit from its theft of Center Stage's trade secrets. Center Stage therefore seeks a permanent injunction: (a) barring Defendants Suchil and Imperial Floors from disclosing and/or using Center Stage's trade secrets and confidential information; and (b) providing for all additional restrictions

necessary to protect Center Stage from the harm likely to result from Suchil and Imperial Floor's continued wrongful conduct.

## VIII.   PRAYER FOR RELIEF

71.   Based on the foregoing allegations, Center Stage prays that the Court enter judgment in Center Stage's favor on its claims against Suchil and Imperial Floors, and award Center Stage the following remedies against Suchil and Imperial Floors:

   a. An order preliminarily and permanently enjoining Suchil and Imperial Floors and all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privity with any of them, from further misconduct including, but not limited to, fraudulent acts, misappropriation of Center Stage's trade secrets under the DTSA and TUTSA.

   b. A final order in Center Stage's favor and holding Suchil and Imperial Floors jointly liable for all claims set forth herein;

   c. An order requiring an account of profits from Suchil and Imperial Floors;

   d. Actual damages;

   e. Consequential damages;

   f. Unjust enrichment;

   g. Reasonable royalties;

   h. Reasonable attorney's fees;

   i. Exemplary damages;

   j. Prejudgment and postjudgment interest as permitted by law;

   k. Costs; and

   l. Any other legal or equitable relief that Center Stage may be entitled to recover, including permanent injunctive relief.

Dated: August 12, 2022　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　By:　*/s/ Alison Battiste Clement*
　　　　　　　　　　　　　　　　　　**ALISON BATTISTE CLEMENT**
　　　　　　　　　　　　　　　　　　State Bar No. 24062603
　　　　　　　　　　　　　　　　　　aclement@munckwilson.com
　　　　　　　　　　　　　　　　　　**MUNCK WILSON MANDALA, LLP**
　　　　　　　　　　　　　　　　　　600 Banner Place Tower
　　　　　　　　　　　　　　　　　　12770 Coit Road
　　　　　　　　　　　　　　　　　　Dallas, Texas 75251
　　　　　　　　　　　　　　　　　　Telephone: 972.628.3600
　　　　　　　　　　　　　　　　　　Facsimile: 972.628.3616

　　　　　　　　　　　　　　　　　　**COUNSEL FOR PLAINTIFF**
　　　　　　　　　　　　　　　　　　**DFW DANCE FLOORS, LLC d/b/a**
　　　　　　　　　　　　　　　　　　**CENTER STAGE FLOORS**