## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **DFW DANCE FLOORS, LLC D/B/A** | § | |
| **CENTER STAGE FLOORS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:22-cv-01775-N** |
| **v.** | § | |
| | § | |
| **BENJAMIN SUCHIL, AND IMPERIAL** | § | **JURY TRIAL DEMANDED** |
| **FLOORS, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## THIRD AMENDED COMPLAINT

Plaintiff DFW Dance Floors, LLC d/b/a Center Stage Floors ("Plaintiff" or "Center Stage") files this Third Amended Complaint[1] against Defendants Benjamin Suchil ("Suchil") and Imperial Floors, LLC ("Imperial Floors") (collectively, "Defendants").

## I.    INTRODUCTION

1.    Center Stage offers novel dance floors for luxury events. Chris Soiset ("Soiset"), Center Stage's owner, conceived of and designed the floors and the process for constructing the floors in his garage with funding from a second mortgage on his home. Suchil, a high school graduate with no previous flooring or events experience, was Center Stage's former Operations Manager until April 2021 when he quit along with most of Center Stage's staff. Prior to quitting, Suchil began a competing company, Imperial Floors, using Center Stage's trade secrets. To lure Center Stage's clients to Imperial Floors, Suchil created chaos and panic amongst Center Stage's clients while he fraudulently tried to purchase Center Stage. Center Stage later learned that five

---

[1] On June 8, 2023, Plaintiff filed a Motion for Leave to file its First Amended Complaint, which adds a theft claim against Defendants. *See* Dkts. 73, 74. The Court has not yet ruled on that motion.

months before he quit, Suchil pleaded guilty to a felony for injury to a child 14 years or younger and agreed to five years of probation with restrictions on his movements that were detrimental to his position as Operations Manager at Center Stage and the safety of Center Stage's clients.

## II.    THE PARTIES

2.    Plaintiff DFW Dance Floors, LLC d/b/a Center Stage Floors is a Texas limited liability company with its principal place of business in Dallas County, Texas.

3.    Defendant Benjamin Suchil is an individual residing in Dallas County, Texas and has already appeared in this litigation.

4.    Defendant Imperial Floors, LLC is a limited liability company with its principal place of business in Dallas County, Texas, and has already appeared in this litigation.

## III.    JURISDICTION AND VENUE

5.    This Court has original jurisdiction over this lawsuit pursuant to the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. and 28 U.S.C. § 1331.

6.    This Court has personal jurisdiction over Defendants because they reside and are licensed to do business and, in fact, do substantial business in Texas.

7.    The Northern District of Texas is a proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants Suchil and Imperial Floors reside, and a substantial part of the events or omissions giving rise the claims occurred, in this judicial district.

## IV.    FACTUAL BACKGROUND

### A.    Center Stage dominated the specialty dance floor market with its uniquely engineered floor panels and reliable service.

8.    In 2010, Soiset, a licensed engineer with a civil engineering degree from North Carolina State University, began operations as a dance floor rental company using commercially

available floor panels. He worked very hard to provide the best dance floors he could, researching methods, equipment, and materials to make the panels look as good as possible.

9.      Three years later, Soiset concluded that he could not overcome the inherent limitations of the commercially available dance floor panels and spent months designing and developing his own product in his garage. He took out a second mortgage on his home to develop the new product.

10.     Soiset's design is unique in that it uses "blank" dance floor panels that allow an infinite variety of dance floor looks, including glittery and smokey, to give a customized luxury look to any event. Once assembled by Center Stage, the panels form a seamless dance floor. The photos below show a commercially-available dance floor (left) and a Center Stage custom-designed, seamless flooring (right):



11.     Soiset also designed a unique process of applying customized surfaces to blank panels, using a specially designed tool, and connecting the floor panels without exposing any unsightly connectors. While the dance floors can withstand heavy traffic and moisture, the surfaces of the panels are replaceable and recyclable when they are worn. These features allow Center Stage

to efficiently offer unique and custom designs for each event. In addition, Soiset designed a method of customizing the trims on the panels, so that clients could change the colors of the trim to complement the design on the floor panels. Soiset's design and implementation process was novel and no other company offered his unique product and services at that time.

12.     In July 2013, Soiset rolled out the first generation of his new dance floor design and started Center Stage. Center Stage quickly gained a solid reputation for providing the best-looking dance floors in the area, and his business grew considerably. Center Stage has continued to improve its products, including its unique dance floors, and now offers the fifth generation of Soiset's flooring design. Soiset has also applied his design and methods to stages, platforms, bar facades, backdrops and freestanding walls, so that Center Stage can offer its clients the decorative detail, including color and finish, they desire.

13.     Center Stage's unique dance floors propelled it to success, consuming the entire Dallas-Fort Worth market, and creating tremendous demand for its beautiful dance floors. Center Stage was also commissioned to provide its specialty dance floors to other cities around the country because no other company offered comparable products. Wedding and event planners in other cities have requested that Center Stage open branches in their cities. A sales representative from at least one dance floor manufacturer stated that they hoped Center Stage never decided to sell its dance floors because the manufacturer would "be knocked out of the game."

14.     Understanding the value of its unique dance floor design and methods, Center Stage diligently works to protect the design of the dance floors and the processes of connecting and customizing them. It maintains information related to designs, suppliers, processes, and materials on password-protected computers. The information is not available to anyone outside of Center

Stage. In addition, all equipment, inventory, and materials are kept in a locked warehouse with an installed security and monitoring system.

15.     In addition to the competitive advantage bestowed by its novel dance floors, Center Stage is also successful because it has built a reputation of being responsive, reliable, and dependable–all traits that are particularly necessary in the stressful wedding industry. Weddings are extremely demanding events because they are, hopefully, a once-in-a-lifetime display of the bride and groom's love that requires picture-perfect designs, with to-the-minute execution. Wedding planners will not use a vendor that they cannot depend upon to deliver quality services on time. Center Stage built a name that wedding planners trusted to provide its products on time with impeccable service.

**B.**     **Suchil was a key Center Stage employee with access to Center Stage's confidential trade secrets.**

16.     In or around early 2014, Center Stage hired Ben Suchil, a high school graduate with no previous flooring or wedding experience, giving him access to Center Stage's confidential business information. Center Stage and Suchil's employment relationship created a duty, which obligated Suchil to refrain from using Center Stage's confidential or proprietary information acquired during the relationship in a manner adverse to Center Stage. This information included trade secrets like client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels.

17.     In or around August 2018, Center Stage promoted Suchil to Operations Manager, making him a key employee. As Operations Manager, Suchil hired and fired employees, set employee pay and hours, communicated with clients, obtained quotes for jobs, and managed job deliveries and the calendar.

18.    Suchil's position as Operations Manager created a fiduciary duty to not compete with Center Stage while employed and to maintain the confidentiality of Center Stage's proprietary trade secrets. No other employee held a formal manager role with Center Stage.

19.    Upon his hiring, Center Stage explained to Suchil, as it did all other employees, that Center Stage's trade secrets, including client and product information, must remain confidential. Center Stage also took active steps to protect its trade secrets, including password protecting Center Stage's computer, electronic mail, and QuickBooks systems, and disseminating its confidential and proprietary information only on a need-to-know basis. Center Stage derives independent economic value from the fact that its trade secrets are not generally known to those outside of Center Stage.

**C.    While employed by Center Stage, Suchil planned to compete with Center Stage.**

20.    On or about February 21, 2022, at approximately 11:30 am, Suchil asked Soiset to meet him in Center Stage's fabrication room. There, Suchil offered to buy Center Stage for $2.4 million but wanted Soiset to stay on at $60,000 per year as an employee. Considering his own retirement, Soiset began negotiating the sale of Center Stage to Suchil in good faith.

21.    When negotiations did not proceed as he planned, Suchil then asked if he could buy just the floor panels in order to start his own business. Soiset rejected Suchil's request because, as Soiset had previously informed Suchil, the floor panels are proprietary and selling them to a local competitor would harm Center Stage's business.

**D.    In an effort to obtain the novel floor panels at a deep discount, Suchil tried to destroy Center Stage's reputation and extort Center Stage's assets.**

22.    On April 18, 2022, all of Center Stage's employees, except its salesperson, resigned in unison. Stunned by the loss of most of his employees, Soiset quietly began working to rebuild Center Stage's staff in preparation for the weekend's jobs.

23.     Suchil told Soiset that he had already emailed Center Stage's clients and had six flooring jobs lined up for May and June 2022. Presumably, Suchil intended to use Center Stage's now ex-employees to perform those jobs.

24.     On April 20, 2022, taking advantage of Soiset's precarious situation, Suchil told Soiset that he and the now ex-employees would cover Center Stage's jobs that weekend if Soiset sold Center Stage to Suchil. At risk of defaulting on all of the jobs scheduled for that weekend and the next–because most of Center Stage's employees quit two days prior with Suchil–Soiset met with Suchil at Center Stage to discuss a possible sale of the business to Suchil. Suchil told Soiset that he had already received "double-digit" responses from Center Stage clients that wanted to work with Suchil after he left Center Stage.

25.     Suchil offered a Purchase of Business Agreement ("Agreement") for Soiset's signature. Soiset reviewed the Agreement and the two negotiated a deal wherein Suchil would purchase Center Stage's assets for $1.5 million. After negotiations, Soiset accepted Suchil's final terms and signed the Agreement. *See* Exhibit 1 (Purchase of Business Agreement, signed on April 20, 2022). Suchil then ratified the Agreement when he began to act as the new owner of Center Stage by reviewing Center Stage's bank and QuickBooks accounts and bringing back the ex-employees to work at Center Stage.

26.     After Suchil reviewed Center Stage's bank accounts and learned that he would not receive as much cash as he expected,[2] he tried to renegotiate the already binding Agreement and buy Center Stage for $1 million instead. Soiset rejected this offer to renegotiate the binding Agreement.

---

[2] Suchil stated that he expected at least $400,000 in Center Stage's bank accounts.

27.    Then, Suchil tried to change the terms of the binding Agreement again to a deal where Suchil and Center Stage's ex-employees would perform two weeks of jobs for Center Stage, in exchange for Center Stage's inventory, including floor panels and trucks. Soiset rejected that deal. Suchil threatened Soiset that Soiset would "get the shit sued out of [him] for failing to deliver on all the events that weekend and the next." Around this time, Soiset learned that Suchil had already caused panic amongst Center Stage's clients. One client, who Soiset had not told about the mass resignation, sent a threatening and panicked text to both Suchil and Soiset:



28.    Considering that Suchil bragged earlier in the day about his "double-digit" responses from Center Stage clients, it became abundantly clear that Suchil was extorting Center Stage for his own gain by destroying Center Stage's reputation and brand within the wedding and events industries.

29.    The next morning, April 21, 2022, Suchil offered to perform only one week of jobs for Center Stage in exchange for just the inventory–no trucks. Suchil brought eight to ten of Center Stage's ex-employees with him as a reminder to Soiset that Suchil held Center Stage's upcoming jobs hostage. Without the employees, Center Stage would have a difficult time performing its upcoming jobs. Soiset rejected that deal too.

30.    Suchil then abandoned the Agreement and Center Stage. Center Stage's ex-employees now would not return to work at Center Stage.

31.    Without employees to perform the work, Soiset scrambled, with less than one day to prepare, to get a new team to perform the contracted jobs that weekend. Had Suchil not fraudulently pretended to purchase Center Stage, Soiset would have had more time to prepare the staff for the weekend jobs, not less than one day. In addition, Suchil's fraudulent maneuvering allowed the news of the chaos and uncertainty at Center Stage to spread through the wedding and events industries, which caused irreparable damage to Center Stage.

32.    Suchil's planned sabotaging of his eight-year employer that gave him, without an education or experience, a chance and promoted him to operations manager, caused irreparable damage to Center Stage's operations, reputation, and brand.

**E.    <u>Suchil never planned to purchase Center Stage, and instead incited chaos to pave the way for his new company, Imperial Floors, to compete with Center Stage.</u>**

33.    Suchil's timing, with the mass resignation and the immediacy of Center Stage's need to ensure that it was staffed for upcoming jobs, caused considerable injury to Center Stage.

However, nothing compared to Soiset's shock when he later learned of the extent of Suchil's plan to compete with Center Stage while Suchil was still employed by Center Stage.

34.    First, Soiset learned that on March 15, 2022, while still employed by Center Stage, Suchil formed a competing business, Imperial Floors. Suchil did not disclose his competing business to Soiset while he was still employed by Center Stage.

35.    Soiset also learned that, despite Suchil's representations, while Suchil presented, negotiated, entered, and ratified the Agreement, Suchil did not have the capability of purchasing Center Stage for $1.5 million. If Soiset knew this, he would not have wasted valuable time negotiating with Suchil and jeopardizing his immediate jobs. Instead, Soiset would have immediately put a new team in place in preparation for the weekend's jobs, with no interruption and no harm to Center Stage's clients.

36.    Next, Soiset learned that Suchil took Center Stage's quotes and client lists so that his new company, Imperial Floors, could now compete with Center Stage. A picture of a dance floor for a job in June 2022 that Suchil quoted, while still employed by Center Stage, appears prominently on Imperial Floors' website. In addition, many wedding planners, whom Suchil could have only met while providing flooring services for Center Stage, reported that Suchil contacted them after he left Center Stage to get business for Imperial Floors. *See*, *e.g.*, Exhibit 2 (email from Suchil to one of Center Stage's clients trying to get business for Imperial Floors). Suchil blatantly stated in his email to Center Stage's client that he had left Center Stage, formed Imperial Floors LLC, and hoped to continue his working relationship with Center Stage's clients, but on behalf of Imperial Floors. Suchil obtained that client's unpublished Gmail address during his work as a key employee at Center Stage.

37.     Finally, and most disturbingly, Soiset learned that on or about November 17, 2021, Suchil was charged with a third-degree felony against a child fourteen years old or younger, pleaded guilty to intentional injury of a child, and was sentenced to five years of probation on December 1, 2021. *See State of Texas vs. Benjamin Suchil*, Criminal District Court #3 in Dallas, County, Texas, Cause No. 21-00572. Suchil's probation requires him to (1) remain in Kaufman County, Texas, unless he obtains written approval to leave, (2) work faithfully at his employment, (3) not possess or consume alcoholic beverages, and (4) not have unsupervised contact with minor children, except his own. *See* Exhibit 3 (Suchil's Agreed Plea of Guilty).

38.     Suchil's probation restrictions severely interfere with his job managing events. First, it is not clear that Suchil obtained/obtains written approval to provide onsite supervision to the weddings and other events outside Kaufman County. Second, Suchil's sabotage and extortion of Center Stage is not faithful work as required by his probation. Next, it is problematic for a bride and groom to have a worker, who cannot possess or consume alcohol, at their wedding where alcohol is served. Similarly, and most important, it is dangerous for Suchil to be at events, like weddings, where minor children may be present. Ultimately, the bride and groom risk police interrupting their wedding if there is a room flip requiring Suchil's presence because of Suchil's probation violations. Suchil never informed Soiset of his probation despite the fact that these restrictions greatly affected Suchil's availability for jobs performed at Center Stage and the safety of Center Stage's clients. Moreover, Soiset would have never considered selling Center Stage to Suchil if Soiset knew the details of Suchil's criminal charge and probation.

**F.     Suchil and Imperial Floors have possession of Center Stage's floor panels, which were never sold to anyone and Center Stage has never given Suchil or Imperial Floors to take.**

39.     On May 27, 2023, Center Stage received a call from a wedding planner, working at a wedding at the Dallas Country Club ("DCC"). The planner informed Center Stage that

Defendants had installed a floor with which the planner was dissatisfied. The planner asked Center Stage to come to the DCC to set another floor because Defendants would not return. Center Stage agreed. However, upon arrival, Center Stage quickly determined that most of the floor panels used by Defendants were Center Stage's property that must have been stolen by Defendants. The floor panels have distinctive markings that show when they were made and, as the inventor, Center Stage knows each iteration and change to the floor panels. Center Stage also never throws away used or broken floor panels as every component part can be recycled for another use. Defendants could not have acquired the floor panels by any means other than theft.

40.      Center Stage filed a police report with the Dallas Police Department, #097326-2023. The Highland Park Police Department told Center Stage to take its stolen goods because they could not store them, and documented Center Stage 's retrieval of its stolen goods.

**G.      Suchil Tortiously Interfered with Center Stage's Contracts Prior to and After Leaving his employment at Center Stage.**

41.      During this litigation, Defendants have employed extraordinary methods to resist producing their documents, including failing to provide documents when ordered by the Court. *See* Dkt. 87.[3] After over eight months, Defendants have finally begun producing responsive documents.

42.      Amongst the documents Defendants finally produced are documents showing that Suchil began working with at least one of Center Stage's clients prior to quitting his employment with Center Stage. Coincidently, the client is the same client discussed in paragraph 27 *supra*. Suchil shared Center Stage's confidential information about other clients with the client and sought

---

[3] On July 13, 2023, Judge Toliver ordered Defendants to produce documents by July 13, 2023. *See* Dkt. 81. Defendants produced their documents on August 11, 2023. *See* Dkt. 89.

her advice in planning his resignation from Center Stage and building his new company to compete with Center Stage. Suchil initially met the client through his employment with Center Stage.

43.    In addition, prior to leaving his employment with Center Stage, Suchil assisted in quoting and invoicing a job with the same client. The job required Center Stage to acquire specialty materials. Center Stage acquired materials, as invoiced, for the client. Then, Suchil secretly worked with the client to start Imperial Floors, while sabotaging Center Stage.

44.    After Suchil resigned from Center Stage, Imperial Floors performed part of the job Center Stage invoiced for the client and Center Stage had to reimburse the client in full for that part of the job. Suchil kept the materials Center Stage purchased for that part of the job, and very likely re-used those materials for other clients. Neither Suchil nor the client reimbursed Center Stage for those materials.

45.    Finally, on August 11, 2023, after being ordered to produce its bank records by this Court, Plaintiff received Defendants' bank records which show that Defendants are enjoying the fruits of misappropriating a turn-key operation. Because Defendants took Plaintiff's clients, employees, materials, process and procedures, trade secrets, and likely more, Defendants have enjoyed low overhead and start-up costs at Plaintiff's expense.

### V.    CAUSES OF ACTION

**A.    First Cause of Action: Breach of Fiduciary Duty against Suchil**

46.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

47.    An informal fiduciary relationship, which generally encompasses good faith, fair dealing, integrity, and fidelity, may arise between an employee and employer. When such a fiduciary relationship exists, the employee has a duty to act primarily for the benefit of the employer in matters connected with his employment. While an employee retains the right to

prepare to compete with his or her employer, Texas law prohibits an employee from appropriating trade secrets from his employer and carrying away confidential information, including client lists.

48.     During the period of his employment with Center Stage, Suchil had an obligation to refrain from appropriating Center Stage's trade secrets and carrying away Center Stage's client information to compete against Center Stage. These restrictions protect Center Stage's legitimate business interests, including its confidential information, goodwill among clients, and protected business relationships. Suchil breached his fiduciary duty by using Center Stage's confidential and proprietary information to solicit Center Stage's clients to compete with Center Stage. *See*, *e.g.*, Exhibit 2.

49.     Suchil also breached his fiduciary duty by not informing Center Stage of his criminal probation and its restrictions, which potentially subjected Center Stage to liability and risked interrupting Center Stage's operations.

50.     Center Stage has suffered and will continue to suffer damages and irreparable harm as a result of Suchil's breach of this duty, including loss of its business and contractual relationships, diminished value of its confidential information, harm to its goodwill and reputation, and loss of its employees.

51.     As a direct and proximate result of the unlawful, malicious, wrongful, and fraudulent conduct on the part of Suchil, Center Stage was injured, continues to suffer actual damages, and is entitled to exemplary damages.

52.     Center Stage cannot be adequately compensated through remedies at law alone, and thus requires equitable relief in addition to compensatory and punitive relief.

53.     The actions of Suchil will continue to cause damages and irreparable harm to Center Stage if not restrained.

**B.** **Second Cause of Action: Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, against Suchil and Imperial Floors.**

54.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

55.    Center Stage's confidential, proprietary, and trade secret information relates to products used in, or intended for use in, interstate or foreign commerce.

56.    As described above, Center Stage alleges that Suchil retained, after his employment ended and in violation of his common law fiduciary duty, Center Stage's trade secrets as that term is defined in 18 U.S.C. § 1839(3). The trade secrets include information regarding Center Stage's client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels. Center Stage took reasonable measures to keep its proprietary and confidential information secret. These measures consist of physical and/or technological safeguards, including storing information on password-protected software and computers, and controlling who has access to the information. This information derives economic value for Center Stage from not being generally known to, and not being readily ascertainable through proper means by another person or company that can obtain economic value from the disclosure or use of the information.

57.    Center Stage has expended significant money and effort developing its products, methods, and systems, and the information would be difficult to properly acquire or duplicate by any of Center Stage's competitors.

58.    Center Stage alleges that Suchil and Imperial Floors misappropriated Center Stage's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets. Specifically, Suchil and Imperial Floors acquired, disclosed, and used Center Stage's trade secrets by breaching or inducing a breach of Suchil's common law

fiduciary duty to Center Stage to maintain secrecy. In addition, at the time they used or disclosed Center Stage's trade secrets, Suchil and Imperial Floors knew or had reason to know that their knowledge of Center Stage's trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of Center Stage's trade secrets or limit their use, or was derived from or through persons who owed a duty to Center Stage to maintain secrecy of Center Stage's trade secrets or limit their use, in violation of 18 U.S.C. § 1839(5)(A)–(B).

59.     Suchil disclosed Center Stage's trade secrets to Imperial Floors and both Suchil and Imperial Floors used the misappropriated trade secrets to compete with Center Stage with Center Stage's clients. For example, on May 1, 2022, Suchil contacted Center Stage's client to solicit business for Imperial Floors. *See* Exhibit 2. Suchil obtained that client's unpublished Gmail address during his work at Center Stage. Upon information and belief, Suchil and Imperial Floors continue to use the misappropriated trade secrets by soliciting business from clients of Center Stage.

60.     Suchil and Imperial Floors have gained an improper competitive advantage over Center Stage that has caused or may cause Center Stage to lose out on business that it would have otherwise obtained. Their conduct, and their ongoing and continuing use of the trade secrets and proprietary and confidential information of Center Stage, has caused, and will cause, Center Stage repeated and irreparable injury. Center Stage's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Suchil and Imperial Floors.

61.     As remedies for Suchil and Imperial Floor's misappropriation of its trade secrets, Center Stage seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by 18 U.S.C. § 1836(b)(3)(B)(i). As

an alternative to lost profits, Center Stage seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Suchil's and Imperial Floor's unauthorized disclosure and use of the trade secret, as authorized by 18 U.S.C. § 1836(b)(3)(B)(ii). Given the willful and malicious nature of Suchil's misappropriation, Center Stage also seeks attorneys' fees and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

**C.    Third Cause of Action: Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code Ann. § 134A.002, et. seq. against Suchil and Imperial Floors.**

62.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

63.    As described above, Center Stage alleges that Suchil retained, after his employment ended and in violation of his common law fiduciary duty, Center Stage's trade secrets as that term is defined in Section 134A.002(6) of the Texas Civil Practices and Remedies Code. The trade secrets include information regarding Center Stage's client lists, employee information, client contact information, client preferences, client proposal materials, and confidential and proprietary information regarding Center Stage's novel floor panels. Center Stage took reasonable measures to keep its proprietary and confidential information secret. These measures consist of physical and/or technological safeguards, including storing information on password-protected software and computers, and controlling who has access to the information. This information derives economic value for Center Stage from not being generally known to, and not being readily ascertainable through proper means by another person or company that can obtain economic value from the disclosure or use of the information.

64.    Center Stage has expended significant money and effort developing its products, methods, and systems, and the information would be difficult to properly acquire or duplicate by any of Center Stage's competitors.

65. Center Stage alleges that Suchil and Imperial Floors misappropriated Center Stage's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets. Specifically, Suchil and Imperial Floors acquired, disclosed, and used Center Stage's trade secrets by breaching or inducing a breach of Suchil's common law fiduciary duty to Center Stage to maintain secrecy. In addition, at the time it used or disclosed Center Stage's trade secrets, Suchil and Imperial Floors knew or had reason to know that their knowledge of Center Stage's trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of Center Stage's trade secrets or limit their use, or was derived from or through persons who owed a duty to Center Stage to maintain secrecy of Center Stage's trade secrets or limit their use, in violation of TUTSA, §§ 134A.002, 134A.003.

66. Suchil disclosed Center Stage's trade secrets to Imperial Floors and both Suchil and Imperial Floors used the misappropriated trade secrets to compete with Center Stage with Center Stage's clients. For example, on May 1, 2022, Suchil contacted Center Stage's client to solicit business for Imperial Floors. *See* Exhibit 2. Suchil obtained that client's unpublished Gmail address during his work at Center Stage. Upon information and belief, Suchil and Imperial Floors continue to use the misappropriated trade secrets by soliciting business from clients of Center Stage.

67. Suchil and Imperial Floors have gained an improper competitive advantage over Center Stage that has caused or may cause Center Stage to lose out on business that it would have otherwise obtained. Their conduct, and their ongoing and continuing use of the trade secrets and proprietary and confidential information of Center Stage, has caused, and will cause, Center Stage repeated and irreparable injury. Center Stage's remedy at law is not, by itself, adequate to compensate for the injuries already inflicted and further threatened by Suchil and Imperial Floors.

68.     As remedies for Suchil and Imperial Floor's misappropriation of its trade secrets, Center Stage seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by TUTSA, § 134A.004. As an alternative to lost profits, Center Stage seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Suchil's and Imperial Floor's unauthorized disclosure and use of the trade secret, as authorized by TUTSA, § 134A.004. Given the willful and malicious nature of Suchil's misappropriation, Center Stage also seeks attorneys' fees and exemplary damages pursuant to TUTSA, §§ 134A.002, 134A.003.

**D.     Fourth Cause of Action: Fraud against Suchil**

69.     As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

70.     As described above, on or about April 20, 2022 at Center Stage's office, while Suchil was pretending to purchase Center Stage in an effort to create chaos and confusion amongst Center Stage's clients, Suchil failed to disclose material facts to Soiset. Suchil did not have the means to purchase Center Stage, and had been sentenced to probation five months prior, restricting his ability to travel outside of Kaufman County and his presence around children and alcohol. Suchil misrepresented and omitted these material facts with the intention of defrauding Center Stage so that he could build his competing business. Center Stage relied on Suchil's misrepresentations and omissions to its detriment, causing Center Stage injury.

71.     As a direct and proximate result of the unlawful, malicious, wrongful, and fraudulent conduct on the part of Suchil, Center Stage has been injured and has suffered actual damages, and Center Stage is entitled to exemplary damages.

**E.**  **Fifth Cause of Action: Breach of Contract against Suchil**

72.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

73.    As described above, on April 20, 2022, Suchil offered the Agreement to purchase Center Stage for Soiset's signature. Eventually, Soiset agreed to Suchil's final offer and signed the Agreement, creating a binding and enforceable contract, which Suchil ratified. *See* Exhibit 1. Suchil then abandoned the Agreement, breaching its terms.

74.    As a result of Suchil's breach of the Agreement, Center Stage has been injured and has suffered consequential damages and Center Stage seeks such damages and attorney fees as a result.

**F.**  **Sixth Cause of Action: Suchil and Imperial Floors' Violation of the Texas Theft Liability Act[4]**

75.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

76.    Center Stage had a possessory right to its property, including its materials.

77.    Suchil and Imperial Floors unlawfully appropriated Center Stage's property by taking it without Center Stage's consent.

78.    Suchil and Imperial Floors appropriated the property with the intent to deprive Center Stage of the property.

79.    Center Stage sustained damages as a result of the theft.

---

[4] The Court has not yet ruled on Plaintiff's Motion for Leave to file its First Amended Complaint, which adds this theft claim against Defendants. *See* Dkts. 73, 74.

**G.**     <u>**Seventh Cause of Action: Suchil's Tortious Interference with a Contract**</u>

80.     As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

81.     Center Stage had a valid contract for services with the client described in paragraphs 27, 41-44 *supra*.

82.     Suchil willfully and intentionally interfered with the contract, by coordinating his sabotaging of Center Stage with the client and misappropriating the materials acquired by Center Stage for the client. Then, Suchil performed the client's job on behalf of Imperial Floors.

83.     The interference proximately caused Center Stage's injury.

84.     Center Stage incurred actual damages and losses.

**H.**     <u>**Eighth Cause of Action: Suchil's Unjust Enrichment**</u>

85.     As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

86.     Center Stage employed Suchil for approximately seven years. Center Stage provided Suchil with a career, training, advancement, benefits, and a good salary.

87.     Suchil accepted all these benefits and prospered by what Center Stage provided him.

88.     Suchil then sabotaged Center Stage, stole everything he could from Center Stage, including its employees, clients, trade secrets, and materials. Suchil did all this while still employed by Center Stage and when he owed Center Stage a fiduciary duty.

89.     Suchil now enjoys the benefits of misappropriating a turn-key operation.

90.     It would be inequitable for Suchil to enjoy these benefits without compensating Center Stage.

## VI.     JURY DEMAND

91.    Center Stage demands a trial by jury.

## VII.     PERMANENT INJUNCTION

92.    As the factual basis for its allegations, Center Stage incorporates the prior paragraphs of its Complaint as if set forth fully herein.

93.    Unless Suchil and Imperial Floors are permanently enjoined, they will continue to profit from its theft of Center Stage's trade secrets. Center Stage therefore seeks a permanent injunction: (a) barring Defendants Suchil and Imperial Floors from disclosing and/or using Center Stage's trade secrets and confidential information; and (b) providing for all additional restrictions necessary to protect Center Stage from the harm likely to result from Suchil and Imperial Floor's continued wrongful conduct.

## VIII.     PRAYER FOR RELIEF

94.    Based on the foregoing allegations, Center Stage prays that the Court enter judgment in Center Stage's favor on its claims against Suchil and Imperial Floors, and award Center Stage the following remedies against Suchil and Imperial Floors:

a.    An order preliminarily and permanently enjoining Suchil and Imperial Floors and all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privity with any of them, from further misconduct including, but not limited to, fraudulent acts, misappropriation of Center Stage's trade secrets under the DTSA and TUTSA.

b.    A final order in Center Stage's favor and holding Suchil and Imperial Floors jointly liable for all claims set forth herein;

c.    An order requiring an account of profits from Suchil and Imperial Floors;

d.    Actual damages;

e.    Additional damages;

f.    Consequential damages;

g.    Unjust enrichment;

h.    Reasonable royalties;

i.    Disgorgement damages;

j.    Reasonable attorney's fees;

k.    Exemplary damages;

l.    Prejudgment and post judgment interest as permitted by law;

m.    Costs; and

n.    Any other legal or equitable relief that Center Stage may be entitled to recover, including permanent injunctive relief.


Dated: February 3, 2025                          Respectfully submitted,

By: */s/Alison Battiste Clement*

**ALISON BATTISTE CLEMENT**
State Bar No. 24062603
alison@battisteclement.com
**BATTISTE CLEMENT PLLC**
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
TELE: 214-540-7206
FAX: 972-629-9818

Michael K. Hurst
Texas Bar No. 10316310
mhurst@lynnllp.com
**Mary Goodrich Nix**
Texas Bar No. 24002694
mnix@lynnllp.com
**LYNN PINKER HURST &
SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800

**COUNSEL FOR PLAINTIFF DFW
DANCE FLOORS, LLC D/B/A CENTER
STAGE FLOORS**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this document has been served via the Court's CM/ECF to counsel of record in accordance with the Federal Rules of Civil Procedure on February 3, 2025.

*/s/ Alison Battiste Clement*
**Alison Battiste Clement**

4888-7036-4609, v. 1

## PURCHASE OF BUSINESS AGREEMENT

**THIS PURCHASE OF BUSINESS AGREEMENT** (the "Agreement") made and entered into this
4/20/22 day of _APRIL_, _2022_ (the "Execution Date"),

**BETWEEN:**

John Christen Soiset of 6118 Woodcrest Lane Dallas, TX 75214

(the "Seller")

OF THE FIRST PART

and

Benjamin Suchil of 1818 Ramsgate Rd Forney, TX 75126

(collectively and individually the "Purchaser")

OF THE SECOND PART

**BACKGROUND**

a. The Seller carries on the business of Event industry at 3700 Dilido Rd. ste 204 Dallas, TX 75228 (the "Business").

b. The Seller owns the assets of the Business and desires to sell certain assets (the "Assets"), to the Purchaser, subject to any exclusions set out in this Agreement and the Purchaser desires to buy the Assets.

**IN CONSIDERATION** of the provisions contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which consideration is acknowledged, the Parties agree as follows:

### Definitions

1. The following definitions apply in the Agreement:

    a. The "Assets" to be included in this Agreement include all assets of the Seller. There are no excluded assets. The Assets consist of the following:

        i. all equipment used in carrying on the Seller;

ii. all inventory and packaging;

iii. all outstanding and confirmed sales orders;

iv. all interests of the Seller under contracts or agreements relating to the Seller;

v. all books, records and files, relevant to carrying on the Seller;

vi. title to registered or unregistered trade marks and trade names; and

vii. Entirety of Center Stage Floors;

and do not include any Excluded Assets; EXCLUDED ASSETS INCLUDE ALL PAID-FOR ACRYLIC SHEETS STORED AT REGAL PLASTICS, SELLER WILL SELL SHEETS TO BUYER AT ORIGINAL PRICE

b. "Closing" means the completion of the purchase and sale of the Assets as described in this Agreement by the payment of agreed consideration, and the transfer of title to the Assets;

c. "Environmental Law" means any and all statutes, regulations, common laws or any other directives having force of law pertaining to protection of the environment including but not limited to all laws affecting the production, manufacture, storage, transport and disposal of Hazardous Materials.;

d. "Hazardous Material" means any material or substance of any description that could reasonably be expected to cause harm or damage to the health of man or any other living organism.; and

e. "Parties" means both the Seller and the Purchaser and "Party" means any one of them.

**Sale**

2. Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties, and conditions set out in this Agreement, the Seller agrees to sell the Assets to the Purchaser and the Purchaser agrees to purchase the Assets from the Seller.

**Purchase Price**

2

*Purchase of Business Agreement*

3. The Parties agree that the Purchase Price for the Assets will be allocated among the Assets as follows subject to required adjustments that are agreed upon by the Parties:

| | |
|---|---|
| Business equipment | $ _____ |
| Inventory and packaging | $ _____ |
| Outstanding sales orders | $ _____ |
| Outstanding business contracts | $ _____ |
| Books, records and files | $ _____ |
| Trade marks and trade names | $ _____ |
| Entirety of Center Stage Floors | $1,500,000.00 |
| **Purchase Price** | $1,500,000.00 |

VALUES OF INDIVIDUAL ITEMS TBD. SUM IS AGREED TO

DOES NOT INCLUDE REFERENCE ACRYLIC SHEET AS OF THIS DAT STORED AT REGAL PLASTICS.

4. The Parties agree to co-operate in the filing of elections under the *Internal Revenue Code* and under any other applicable taxation legislation, in order to give the required or desired effect to the allocation of the Purchase Price.

**Closing**

5. The Closing of the purchase and sale of the Assets will take place on the _____ day of _____, _____ (the "Closing Date") at the offices of the Seller or at such other time and place as the Parties mutually agree.

↳ TO BE DETERMINED BY AVAILABILITY OF FUNDS

6. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will deliver the Assets to the Purchaser. The Seller will deliver to the Purchaser possession of the Assets, in the same condition as on the Execution Date, and free and clear of any liens, charges, rights of third parties, or any other encumbrances, except those attached as a result of the Purchaser's actions.

7. At Closing and upon the Purchaser paying the Purchase Price in full to the Seller, the Seller will provide the Purchaser with duly executed forms and documents evidencing transfer of the Assets, where required including, but not limited to, bills of sale, assignments, assurances, and consents.

The Seller will also co-operate with the Purchaser as needed in order to effect the required registration, recording, and filing with public authorities of the transfer of ownership of the Assets to the Purchaser.

## Payment

8. The Purchase Price for the Assets will be paid by the Purchaser in one lump sum payment to the Seller in the form of a certified check, a Teller's Check or an electronic money or funds transfer. In the case of an electronic money or funds transfer, the Seller will give notice to the Purchaser of the bank account particulars at least 5 business days prior to the Closing Date.

9. The Purchaser is responsible for paying all applicable taxes, including federal sales tax, state sales tax, duties, and any other taxes or charges payable pursuant to the transfer of the Assets from the Seller to the Purchaser.

## Seller's Representations and Warranties

10. The Seller represents and warrants to the Purchaser that:

   a. the Seller has full legal authority to enter into and exercise its obligations under this Agreement;

   b. the Seller is the absolute beneficial owner of the Assets, with good and marketable title, free and clear of any liens, charges, encumbrances or rights of others. The Seller is exclusively entitled to possess and dispose of the Assets;

   c. to the best knowledge of the the Seller there is no pending or anticipated claim against the Assets or against the Seller's ownership or title in the Assets or against the Seller's right to dispose of the Assets;

   d. no third party contract is outstanding that could result in a claim against or affecting the Assets in whole or in part either now or in the future;

   e. the Seller does not have any outstanding contracts, agreements, or commitments of any kind, written or oral, with any third party regarding the Business or the Assets, except for any material contracts described in, and/or attached to this Agreement. The Seller represents and warrants that no material default or breach exists with regard to any presently outstanding material contract; WILL BE

CONTRACTS TO BE ADDED TO
AGREEMENT AND WILL BY THE
PURCHASER WITHOUT ADDITIONAL COMPENSATION
FROM SELLER

f. execution of this Agreement will not hinder or unfairly disadvantage any pre-existing creditor;

g. except as otherwise provided in this Agreement, there has been no act or omission by the Seller that would give rise to any valid claim relating to a brokerage commission, finder's fee or other similar payment;

h. the Seller is a resident of the United States for the purposes of the *Internal Revenue Code;*

i. the Seller has withheld all amounts relating to the Business required to be withheld under income tax legislation and has paid all amounts owing to the proper authorities;

j. the Seller is not bound by any written or oral pension plan or collective bargaining agreement or obligated to make any contributions under any retirement income plan, deferred profit sharing plan or similar plan;

k. the Seller will not dismiss any current employees of the Business or hire any new employees, or substantially change the role or title of any existing employees, provide unscheduled or irregular increases in salary or benefits to employees, or institute any significant changes to the terms of any employee's employment, after signing this Agreement, unless the Purchaser provides written consent;

l. there are no claims threatened or pending against the Seller by any current or past employee relating to any matter arising from or relating to the employment of the employee; AT POINT OF EXECUTION, UNLESS BASED ON PRIOR EVENTS OR OCCURING THROUGH MONDAY 4/25/22

m. the Assets, while owned by the Seller, have been maintained at all times in accordance with standard industry practice. The Seller further warrants that all tangible assets are in good working order;

n. the Seller is operating in accordance with all applicable laws, rules, and regulations of the jurisdictions in which it is carried on. In compliance with such laws, the Seller has duly licensed, registered, or qualified the Seller with the appropriate authorities and agencies;

o. the Seller has not produced, manufactured, stored, transported or disposed of any Hazardous Materials of any kind and to the best knowledge of the Seller, no discharge, leakage or release of Hazardous Materials, whether accidental or otherwise, has occurred for which the Purchaser could ultimately become liable. There are no ongoing, pending,

threatened or anticipated civil or criminal actions, enquiries or investigations with regard to the breach of any applicable Environmental Laws;

p. the Seller maintains insurance policies on the Assets and such policies are in full force and effect and of an adequate value as would be reasonable in its industry. The Seller has neither defaulted under these insurance policies, whether as a result of failure to pay premiums or due to any other cause, nor has the Seller failed to give notice or make a claim under these insurance policies in a timely manner;

q. the trademarks and trade names used in carrying on the Business are owned exclusively and validly by the Seller. The trademarks and trade names are duly registered with the appropriate public authorities in order that the rights associated with the trademarks and trade names are protected. To the best knowledge of the Seller, there are no claims of infringement existing against the patents, trademarks, copyrights or any other trade names used by the Seller;

r. any trademarks and trade names used in whole or in part in or required for the proper operation of the Business are validly and beneficially owned by and for the sole and exclusive use of the Seller;

s. to the best knowledge of the Seller, the conduct of the Seller does not infringe on the patents, trademarks, trade names or copyrights, whether domestic or foreign, of any other person, firm or corporation;

t. the Seller owns or is licensed to use all necessary software and it can continue to use any and all computerized records, files and programs after the Closing Date in the same manner as before the Closing Date;

u. the Seller has filed all tax reports and returns required in the operation of the Business and has paid all taxes owed to all taxing authorities, including foreign taxing authorities, except amounts that are being properly contested by the Seller, the details of this contest having been provided to the Purchaser; and

v. this Agreement has been duly executed and delivered by the Seller and constitutes a legal and binding obligation of the Seller, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction.

6

11. The representations and warranties given in this Agreement are the only representations and warranties. No other representation or warranty, either expressed or implied, has been given by the Seller to the Purchaser, including, without limitation, any representations or warranties regarding the merchantability of the Assets or their fitness for a particular purpose.

12. The Seller warrants to the Purchaser that each of the representations and warranties made by it is accurate and not misleading at the Closing Date. The Seller acknowledges that the Purchaser is entering into this Agreement in reliance on each representation and warranty.

13. The Seller's representations and warranties will survive the Closing Date of this Agreement.

14. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, the Seller will have no liability to the Purchaser unless the Purchaser provides notice in writing to the Seller containing full details of the claim on or before the third anniversary of the Closing Date.

15. Where the Purchaser has a claim against the Seller relating to one or more representations or warranties made by the Seller, and the Purchaser is entitled to recover damages from a third party then the amount of the claim against the Seller will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Purchaser in recovering the amount from the third party.

## **Purchaser's Representations and Warranties**

16. The Purchaser represents and warrants to the Seller the following:

   a. the Purchaser has full legal authority to enter into and exercise its obligations under this Agreement;

   b. the Purchaser has funds available to pay the full Purchase Price and any expenses accumulated by the Purchaser in connection with this Agreement and the Purchaser has not incurred any obligation, commitment, restriction, or liability of any kind, absolute or contingent, present or future, which would adversely affect its ability to perform its obligations under this Agreement;

   c. the Purchaser has not committed any act or omission that would give rise to any valid claim relating to a brokerage commission, finder's fee, or other similar payment;

    d. the Purchaser is a resident of the United States for the purposes of the *Internal Revenue Code;*

    e. this Agreement has been duly executed by the Purchaser and constitutes a legal and binding obligation of the Purchaser, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy and insolvency, by other laws affecting the rights of creditors generally, and by equitable remedies granted by a court of competent jurisdiction; and

    f. the Purchaser has no knowledge that any representation or warranty given by the Seller in this Agreement is inaccurate or false.

17. The representations and warranties given in this Agreement are the only representations and warranties. The Purchaser has given no other representation or warranty, either expressed or implied, to the Seller.

18. The Purchaser warrants to the Seller that each of the representations and warranties made by it is accurate and not misleading at the date of Closing. The Purchaser acknowledges that the Seller is entering into this Agreement in reliance on each representation and warranty.

19. The Purchaser's representations and warranties will survive the Closing Date of this Agreement.

20. Where the Seller has a claim against the Purchaser relating to one or more representations and warranties made by the Purchaser, the Purchaser will have no liability to the Seller unless the Seller provides notice in writing to the Purchaser containing full details of the claim on or before the third anniversary of the Closing Date.

21. Where the Seller has a claim against the Purchaser relating to one or more representations or warranties made by the Purchaser, and the Seller is entitled to recover damages from a third party then the amount of the claim against the Purchaser will be reduced by the recovered or recoverable amount less all reasonable costs incurred by the Seller in recovering the amount from the third party.

## **Conditions Precedent to be Performed by the Purchaser**

22. The obligation of the Seller to complete the sale of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Purchaser, on or before the Closing Date, each of which is acknowledged to be for the exclusive benefit of the Seller and may be waived by the Seller entirely or in part:

a. all of the representations and warranties made by the Purchaser in this Agreement will be true and accurate in all material respects on the Closing Date; and

b. the Purchaser will obtain or complete all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or any governmental or public body, required of the Purchaser in connection with the execution of this Agreement.

### **Conditions Precedent to be Performed by the Seller**

23. The obligation of the Purchaser to complete the purchase of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Seller, on or before the Closing Date, each of which is acknowledged to be for the exclusive benefit of the Purchaser and may be waived by the Purchaser entirely or in part:

    a. all of the representations and warranties made by the Seller in this Agreement will be true and accurate in all material respects on the Closing Date;

    b. the Seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or governmental or public body that are required of the Seller for the proper execution of this Agreement and transfer of the Assets to the Purchaser;

    c. no substantial damage to or alteration of the Assets that would adversely affect their value will occur between the date this Agreement is signed and the Closing Date;

    d. the Seller will have obtained any necessary consents for assigning any leases to the Purchaser as well as providing estoppel certificates from such owners or landlords that there are no arrears of rent, no breaches under such leases and the amount of the security deposits held by such third parties;

    e. the Seller will execute and deliver bills of sale for the Assets in favor of the Purchaser;

    f. the Seller will provide the Purchaser with complete information concerning the operation of the Seller, in order to put the Purchaser in a position to carry on in the place of the Seller;

      g. the Seller will apply for and obtain all necessary consents and authorizations required under change of control clauses in any existing third party contracts which the Corporation has entered into and which are intended to subsist after the Closing;

      h. Seller will not purchase/acquire, sell, gift, or loan any assets under/from  Center Stage Floors without buyers consent.;

      i. Seller agrees to not increase the sell price of the company above $1,500,000.00.

**Conditions Precedent Not Satisfied**

24. If either Party fails to satisfy any of its conditions precedent as set out in this Agreement on or before the Closing Date and that condition precedent was not waived, then this Agreement will be null and void  and there will be no further liability as between the Parties.

**Disclosure**

25. Upon the reasonable request of the Purchaser, the Seller will, from time to time, allow the Purchaser and its agents, advisors, accountants, employees, or other representatives to have reasonable access to the premises of the Seller and to all of the books, records, documents, and accounts of the Seller, during normal business hours, between the date of this Agreement and the Closing Date, in order for the Purchaser to confirm the representations and warranties given by the Seller in this Agreement.

**Employees**

26. The Purchaser agrees to hire selected employees of the Seller (the "Transferred Employees"), effective as of the Close of this Agreement. At least 30 days prior to the Closing Date, the Purchaser will provide written offers of employment to all Transferred Employees. The offers of employment will be subject to execution of this Agreement. Prior to the Closing Date the Purchaser will make itself available to discuss with each Transferred Employee the terms of the individual employment offers.

27. The Purchaser will not offer employment to any employee of the Seller who is receiving disability benefits under a disability plan of the Seller as of the Closing Date. Those employees receiving disability benefits will not be considered a Transferred Employee and will remain the full responsibility of the Seller.

28. The Seller will deliver to the Purchaser prior to the Closing Date, such resignations or terminations of each officer or employee of the Seller that is not a Transferred Employee, each such resignation or termination will be effective as of the Closing Date. The Seller will pay all employee compensation incurred by it up to and including the Closing Date and including all salaries, benefits, bonuses and any other compensation of any kind owing to all employees up to and including the Closing Date. The Seller will be responsible for all severance benefits, vacation days, sick days, personal days and other compensated time off accrued by all employees up to and including the Closing Date.

29. The Seller is in compliance with all applicable foreign and domestic statutory rules and regulations respecting employment and employment practices and has withheld and reported all amounts required by law with respect to wages and salaries and the Seller is not liable for any accrued taxes or penalties and is not liable or in arrears to any government or private pension, social security or unemployment insurance authority. The Seller indemnifies the Purchaser for any future liabilities relating to employment and employment practices where the subject of the liability occurred prior to or on the Closing Date.

30. To the best of the Seller's knowledge, information and belief, no labor dispute is currently in progress, pending or threatened involving the Transferred Employees of the Seller that would interfere with the normal productivity or production schedules of the Seller.

31. After the Closing Date, the Purchaser will adopt, assume, and become solely responsible for all Transferred Employee benefit plans including, but not limited to, all health and disability plans and pension plans currently administered by the Seller. The Purchaser will collect and pay over to the Seller any contributions of the Seller's employees that relate to periods prior to and including the Closing Date. The Purchaser agrees to waive all waiting or qualification periods and pre-existing conditions and limitations of such plans for the Transferred Employees.

### Non-Solicitation

32. The Seller agrees that any attempt to encourage or induce employees, directors, agents or contractors to leave their jobs with the Seller would be harmful and damaging to the Purchaser. The Seller further agrees that any attempt on the part of the Seller to interfere with the Purchaser's relationship with employees, directors, agents, contractors, vendors or service providers of the Seller would be harmful and damaging to the Purchaser.

33. The Seller agrees that during the term of this Agreement and for a period of 10 years after the Closing Date of this Agreement, the Seller will not in any way directly or indirectly:

    a. induce or attempt to induce any employee, director, agent, contractor or other service
       provider of the Purchaser to quit employment or retainer with the Purchaser;

    b. otherwise interfere with or disrupt the Purchaser's relationship with its employees,
       directors, agents, contractors or other service providers;

    c. discuss employment opportunities or provide information about competitive employment
       to any of the Purchaser's employees, directors, agents, contractors or other service
       providers; or

    d. solicit, entice, or hire away any employee, director, agent, contractor or other service
       provider of the Purchaser.

### Non-Competition

34. For a period of 10 years (the "Non-Competition Period") after the Closing Date, the Seller will
not, either individually or in conjunction with any other person or business entity or in any other
manner whatsoever, have interest in, enter employment with, lend money to, advise or permit its
name to be associated with any business similar to or in competition with the Purchaser within
the following geographic region: within a 2500 Mile Radius of the business.

35. If the Non-Competition Period is determined to be void or unenforceable by a court of competent
jurisdiction then it is the intent of the Parties that the Non-Competition Period be reduced in
scope only to the extent deemed necessary to render the provision reasonable and enforceable.
The Seller agrees that the Non-Competition Period is reasonable and all defenses to the
enforcement of the Non-Competition Period are waived by the Seller.

### Non-Assumption of Liabilities

36. It is understood and agreed between the Parties that the Purchaser is not assuming and will not be
liable for any of the liabilities, debts or obligations of the Seller arising out of the ownership or
operation of the Seller prior to and including the Closing Date. *D EXCLUDES LOANS
FOR EQUIPMENT & VEHICLES IN POSSESSION AT TIME OF EXECUTION*

37. The Seller will indemnify and save harmless the Purchaser, its officers, directors, employees, and
agents from and against all costs, expenses, losses, claims, and liabilities, including reasonable
legal fees and disbursements, or demands for income, sales, excise or other taxes, suffered or
incurred by the Purchaser or any of the above mentioned persons arising out of the ownership or
operation of the Seller prior to and including the Closing Date.

**Transfer of Third Party Contracts**

38. This Agreement is not to be construed as an assignment of any third party contract from the Seller to the Purchaser if the assignment would be a breach of that third party contract.

39. The Purchaser will be solely responsible for acquiring new contracts with third parties where the existing contracts are not legally assignable from the Seller to the Purchaser.

40. Notwithstanding any other provision in this Agreement to the contrary, the Seller will not be liable for any losses, costs or damages of any kind including loss of revenue or decrease in value of the Seller resulting from the failure of the Purchaser to acquire any third party contracts.

**Notices**

41. Any notices or deliveries required in the performance of this Agreement will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Parties at the addresses contained in this Agreement or as the Parties may later designate in writing.

**Expenses/Costs**

42. The Parties agree to pay all their own costs and expenses in connection with this Agreement.

**Confidentiality**

43. The Seller and the Purchaser will keep confidential all information (the "Confidential Information") pertaining to this Agreement including, but not limited to, the terms of this Agreement, the Purchase Price, the Parties to this Agreement, and the subject matter of this Agreement as well as any written or oral information obtained about the respective Parties that is not currently in the public domain. Confidential Information will not include the following:

    a. information generally known in the respective industries of the Purchaser and the Seller;

    b. information that enters the public domain through no fault of the Purchaser or the Seller;

    c. information that is independently created by the Purchaser or the Seller respectively without direct or indirect use of information obtained during the course of negotiations for this Agreement; and

    d. information that is rightfully obtained by the Purchaser or the Seller from a third party
       who has the right to transfer or disclose the information.

44. The Seller and the Purchaser may disclose any Confidential Information relating to this
Agreement to any of its employees, agents and advisors where there is a need to know in relation
to this Agreement and where the personnel agree to be legally bound by the same confidentiality
obligations.

45. The Parties each agree to indemnify the other against any harm suffered as a result of a breach of
the confidentiality obligations contained in this Agreement on the part of their respective
employees, agents and/or advisers.

46. The confidentiality obligations in this Agreement will continue to apply after the Closing Date of
this Agreement without any limit in time.

## Severability

47. The Parties acknowledge that this Agreement is reasonable, valid, and enforceable; however, if
any part of this Agreement is held by a court of competent jurisdiction to be invalid, it is the
intent of the Parties that such provision be reduced in scope only to the extent deemed necessary
to render the provision reasonable and enforceable and the remainder of the provisions of this
Agreement will in no way be affected or invalidated as a result.

48. Where any provision in this Agreement is found to be unenforceable, the Purchaser and the Seller
will then make reasonable efforts to replace the invalid or unenforceable provision with a valid
and enforceable substitute provision, the effect of which is as close as possible to the intended
effect of the original invalid or unenforceable provision.

## Governing Law

49. This Agreement will be governed by and construed in accordance with the laws of the State of
Texas.

50. The courts of the State of Texas will have jurisdiction to settle any dispute arising out of or in
connection with this Agreement.

## General Provisions

51. This Agreement contains all terms and conditions agreed to by the Parties. Statements or representations which may have been made by any Party to this Agreement in the negotiation stages of this Agreement may in some way be inconsistent with this final written Agreement. All such statements are declared to be of no value to either Party. Only the written terms of this Agreement will bind the Parties.

52. This Agreement may only be amended or modified by a written instrument executed by all of the Parties.

53. A waiver by one Party of any right or benefit provided in this Agreement does not infer or permit a further waiver of that right or benefit, nor does it infer or permit a waiver of any other right or benefit provided in this Agreement.

54. This Agreement will not be assigned either in whole or in part by any Party without the written consent of the other Party.

55. This Agreement will pass to the benefit of and be binding upon the Parties' respective heirs, executors, administrators, successors, and permitted assigns.

56. The clauses, paragraphs, and subparagraphs contained in this Agreement are intended to be read and construed independently of each other. If any part of this Agreement is held to be invalid, this invalidity will not affect the operation of any other part of this Agreement.

57. All of the rights, remedies and benefits provided in this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law or equity.

58. Time is of the essence in this Agreement.

59. This Agreement may be executed in counterpart.

60. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in the neuter gender include the masculine gender and the feminine gender and vice versa.

**IN WITNESS WHEREOF** the Parties have duly affixed their signatures under hand and seal on this _20_ day of _____, _____.

15

WITNESS:_____

                                          _____

                                          John Christen Soiset

WITNESS:_____

                                          _____

                                          Benjamin Suchil

SIGNED IN GOOD FAITH IN
ANTICIPATION OF EXECUTION IN
PRESENCE OF NOTARY WITH
SEAL.

JOHN CHRISTEN SOISET
4/20/22

©2002-2022 LawDepot.com®

---------- Forwarded message ---------
From: **Ben Suchil** <imperialfloorrentals@gmail.com>
Date: Sun, May 1, 2022 at 7:58 PM
Subject: Future
To: ███████████ @gmail.com>

Hi ███ ,

I hope you have been having a great weekend!

As you have probably heard through the grapevine in our industry. I am no longer working at Center Stage Floors, however, I have created my own company Imperial Floors LLC.

My last day at Center Stage Floors was April 18, 2022(Monday).

I can provide acrylic dance floors, custom vinyl graphics, some staging, and acrylic stage facades.

My goal is to increase my services as I grow/expand.

I hope to continue our work relationship.

Ben

Imperial Floors LLC

469-693-0537

IN THE _CVVC S_

**DALLAS COUNTY, TEXAS**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **CAUSE NUMBERS:** |
| | § | F1 8 9...?? |
| VS. | § | Fi _____ |
| _Benjamin Suchil_ | | |

Charged Offense(s): _Sxo Aslt Ch / Injry to Chld_

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now the attorney for the State and the Defendant, by and through his/her attorney of record, and request a continuance of this case(s) to the following date for the following purpose:

RESET DATE: _12/1/21_     TIME: 9:00 a.m.    OR _____ _____

- [ ] Announcement
- [x] Agreed plea of guilty
- [ ] Open plea of guilty

- [ ] Jury Trial (submit Order Setting for Trial

- [ ] Trial Before the Court
      (submit Order Setting...)

- [ ] Motion to Suppress
      (with no trial setting)

- [ ] P/V Announcement
- [ ] P/V Agreed plea of true
- [ ] P/V Open plea of true
- [ ] P/V Contested hearing

- [ ] To hire attorney

Other _____

| Plea Bargain Offer: | | |
|---|---|---|
| _____ years in prison | _____ days/years deferred | |
| _____ days/years in State Jail | _____ regular probation | |
| _____ days/months in County Jail | $_____ Fine | |
| Other: _____ | $_____ Restitution | |

_____    _____    _____
Asst. District Attorney      Attorney for Defendant       Defendant

_____    _____    _____
Phone Number                Phone Number                 Today's Date _____

18

**The State of Texas vs. BENJAMIN SUCHIL**
DOB: 10/11/1987    Sex: Male    Race: White

CDC3

| Offense | Agency |
|---|---|
| INJURY CHILD/ELDERLY/DISABLE W/INT BODILY INJ | TX0572200 |

## INFORMATION NO: F2100572

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

Comes now the undersigned Criminal District Attorney of Dallas County, on behalf of the State of Texas, and presents in and to the Criminal District Court No. 3

that **BENJAMIN SUCHIL,** hereinafter called Defendant, **on or about the 15th day of August, 2017** in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly cause bodily injury to V. S., a child 14 years of age or younger,

Against the peace and dignity of the State.

John Creuzot
Criminal District Attorney
Dallas County, Texas

FILED
21 DEC -1  AM 10: 25
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jamecia Veal    DEPUTY

19

**The State of Texas vs. BENJAMIN SUCHIL** CDC3

DOB: 10/11/1987        Sex: Male        Race: White

| Offense | Agency |
|---|---|
| INJURY CHILD/ELDERLY/DISABLE W/INT BODILY INJ | TX0572200 |

---

### COMPLAINT NO.:  F2100572

---

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

Before me, the undersigned Assistant Criminal District Attorney of Dallas County, Texas, this day personally appeared the undersigned affiant, who upon his oath states that he has good reason to believe and does believe that in the County of Dallas and State of Texas, **BENJAMIN SUCHIL**, hereinafter called Defendant, **on or about the 15th day of August, 2017**, did unlawfully then and there intentionally and knowingly cause bodily injury to **V. S.**, a child 14 years of age or younger,

Sworn to and subscribed before me on the 1st day of December, 2021

_____        _____
Affiant                                                          Assistant Criminal District Attorney
                                                                      Dallas County, Texas

FILED
21 DEC -1 AM 10: 25
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jameeia Yeally DEPUTY

CASE NO. F-2100572-J COUNT NO.

INCIDENT NO./TRN: 9215664173

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE CRIMINAL DISTRICT |
| | § | |
| v. | § | COURT #3 |
| | § | |
| BENJAMIN SUCHIL | § | DALLAS COUNTY, TEXAS |
| | § | |
| STATE ID NO.: TX08843447 | § | |

# ORDER OF DEFERRED ADJUDICATION

| | | |
|---|---|---|
| Judge Presiding: **Audra Riley** | Date Proceedings Deferred: | **12/1/2021** |
| Attorney for State: **Geoffrey Keller** 24046194 | Attorney for Defendant: | F. CLINTON BRODEN 24001495 |

Offense:
INJURY TO A CHILD/ELDERLY/DISABLE

| | |
|---|---|
| Charging Instrument: **INFORMATION** | Statute for Offense: **22.04 Penal Code** |

| | |
|---|---|
| Date of Offense: **8/15/2017** | Defendant waived the right to trial by jury and entered the plea below: **GUILTY** |

| | |
|---|---|
| Degree of Offense: **3RD DEGREE FELONY** | Findings on Deadly Weapon: **N/A** |

| | |
|---|---|
| 1st Enhancement Paragraph: **N/A** | Finding on 1st Enhancement Paragraph: **N/A** |
| 2nd Enhancement Paragraph: **N/A** | Findings on 2nd Enhancement Paragraph: **N/A** |

Terms of Plea Bargain (if any): or ☐ Terms of Plea Bargain are attached and incorporated herein by this reference.
5 YEARS DEFERRED PROBATION; FINE $1,500 PROBATED

## ADJUDICATION OF GUILT DEFERRED;

## DEFENDANT PLACED ON DEFERRED ADJUDICATION COMMUNITY SUPERVISION.

### PERIOD OF DEFERRED ADJUDICATION COMMUNITY SUPERVISION: 5 YEARS.

### CONFINEMENT AS A CONDITION OF DEFERRED ADJUDICATION COMMUNITY SUPERVISION:

☐ The Court ORDERS Defendant confined _____ DAYS in ☐ THE COUNTY JAIL ☐ A STATE JAIL FACILITY as a condition of deferred adjudication community supervision. The period of confinement as a condition of community supervision starts when Defendant arrives at the designated facility, absent a special order to the contrary.

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $ 1,500 PROBATED | $ 290.00 | $ | (See special finding or order of restitution which is incorporated herein by this reference.) |

☐ Defendant is required to register as sex offender in accordance with Chapter 62, Tex. Code Crim. Proc.
(For sex offender registration purposes only) The age of the victim at the time of the offense was N/A .

Was the victim impact statement returned to the attorney representing the State? N/A

This cause was called and the parties appeared. The State appeared by her District Attorney as named above.
**Counsel / Waiver of Counsel (select one)**
☒ Defendant appeared with Counsel.
☐ Defendant appeared without counsel and knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court.

Both parties announced ready for trial. Defendant waived the right of trial by jury and entered the plea indicated above. The Court admonished Defendant. It appeared to the Court that Defendant was mentally competent to stand trial, made the plea freely and voluntarily, and was aware of the consequences of the plea. The Court received the plea and entered it of record. Having heard the evidence submitted, the Court FINDS that such evidence substantiates Defendant's guilt. However, the Court FINDS that it

is in the best interest of society and Defendant to defer proceedings without entering an adjudication of guilt and to place Defendant on deferred adjudication community supervision.

Therefore, the Court ORDERS no judgment entered at this time. The Court further ORDERS Defendant placed on deferred adjudication community supervision for the period of time indicated above as long as Defendant abides by the conditions of the deferred adjudication community supervision.

The Court FINDS that the Presentence Investigation, if so ordered, was done according to the applicable provisions of Subchapter F, Chapter 42A, Tex. Code Crim. Proc.

After having conducted an inquiry into Defendant's ability to pay, the Court **Orders** Defendant to pay the fine, court costs, and restitution, if any, as indicated above.

The document setting forth the conditions of deferred adjudication community supervision is attached and incorporated herein by this reference.

<u>Furthermore, the following special findings or orders apply:</u>

Signed on _____



X _____
AUDRA RILEY
JUDGE PRESIDING

Clerk: J.Veail



Right Thumbprint*

\*Certificate of Thumbprint attached.

**CAUSE NO:** F 21005 72J

STATE OF TEXAS                                                CRIMINAL DISTRICT COURT #3
vs.                                                                                              of
BENJAMIN SUCHIL                                                 DALLAS COUNTY, TEXAS

Supervision Type: DEFERRED                        Offense: INJURY CHILD/ELDERLY/DISABLE W/INT BODILY
                                                                                                                              INJ

## CONDITIONS OF COMMUNITY SUPERVISION

In accordance with the authority conferred by the Community Supervision and Parole Law of the State of Texas
you have been placed on Community Supervision on this date _12/01/21,_ for a period of _5YRS__. It is the
order of this Court that you comply with the following conditions of supervision:

### Please see attached list of conditions of Community Supervision.

You are hereby advised that under the law of this State, the Court shall determine the terms and conditions of
your supervision, and may at any time during the period of Supervision, alter or modify the conditions of your
Supervision. The Court also has the authority at any time during the period of Supervision to revoke your
Supervision and /or proceed to adjudication for violation of any of the conditions of your Supervision set out
above.

Witness our Signatures this 1st day of December, 2021.


_____                        _____
Defendant                                                                   Judge

_____
Court Supervision Officer


**SID: 08843447**

CAUSE NO: F-21-00578

STATE OF TEXAS            CRIMINAL DISTRICT COURT #3

vs.                                  of

BENJAMIN SUCHIL           DALLAS COUNTY, TEXAS

Supervision Type: DEFERRED       Offense: INJURY CHILD/ELDERLY/DISABLE W/INT BODILY INJ

## CONDITIONS OF COMMUNITY SUPERVISION

1.      Commit no offense against the laws of this or any other State or the United States, and do not possess a firearm during the term of Supervision.

2.      Avoid injurious and vicious habits, and do not use marijuana, narcotics, dangerous drugs, inhalants or prescription medication without first obtaining a prescription for said substances from a licensed physician.

3.      Obey all rules and regulations of the Supervision Department, and report in the manner and time as directed by the Judge or Supervision Officer, to-wit: weekly/twice monthly/or monthly on appointed date/time.

4.      Permit the Supervision Officer to visit you at your home or elsewhere, and notify the Supervision Officer not less than twenty-four (24) hours prior to any changes in your home or employment address.

5.      Work faithfully at suitable employment as far as possible, and seek the assistance of the Supervision Officer in your efforts to secure employment when unemployed.

6.      Remain within a specified place; to-wit: KAUFMAN County, Texas, or Approved Supervising County, and do not travel outside KAUFMAN County, or Approved Supervising County, without first having obtained written permission from the Court or Supervising Officer.

7.      Report in person immediately upon your release to the District Clerk Felony Collections Dept. 2nd Fl., Room C2-3 Frank Crowley Bldg., to arrange payment of Court Costs (amount to be assessed by Court Clerk), Fine, and, if assessed Attorney Fees. In addition, pay in full all monies as assessed by the Court pursuant to the payment agreement established by the Felony Collections Department.

8.      Support your dependents.

9.      Pay a Supervision fee of $60.00 per month plus a $2.00 transaction fee to the Supervision Officer of this Court on or before the first day of each month hereafter during Supervision; money order, cashiers check or pay online with credit card at www.paycscd.com.

10.     Participate in the community based program, Dallas Area Crime Stoppers Inc., by making a monetary contribution of $50.00 payable through the Community Supervision Officer of this Court as directed within 90 days of being placed on Community Supervision.

Page 2 of 3

CAUSE NO: F2160057

STATE OF TEXAS                                     CRIMINAL DISTRICT COURT #3
vs.                                                                      of
BENJAMIN SUCHIL                                   DALLAS COUNTY, TEXAS

Supervision Type: DEFERRED          Offense: INJURY CHILD/ELDERLY/DISABLE W/INT BODILY
                                                                                          INJ

## CONDITIONS OF COMMUNITY SUPERVISION

11.    Within 30 days from a referral, defendant is to begin 160 hours of Community Service at an approved
Community Service Project or projects designated by the Community Supervision and Corrections
Department. A processing fee may be required. Hours of service to be completed at the direction of the
Supervising Officer and by the term of Supervision.

12.    Within 30 days from referral, participate in a Drug & Alcohol Evaluation and/or Treatment if
recommended, as offered by the Community Supervision and Corrections Department, or by an
approved agency and comply with the directives of said agency until released successfully by the
Supervising Officer, the approved agency or the Court.

13.    Submit a non-dilute random urine sample and/or medical test/breathalyzer test at the request of the
Supervision Officer to determine the use of illicit drugs or alcohol.

14.    Submit as directed, a buccal swab specimen to the Department of Public Safety under Sub-Chapter G,
Chapter 411, Government Code, for the purpose of creating a DNA record of the defendant (Article 42A
sec 301). All costs incurred are to be paid by the Defendant.

15.    Do not possess, consume or purchase any alcoholic beverages, or illegal controlled substances during
the term of Supervision.

16.    No unsupervised contact with minor children , 17·years of age or younger, directly or indirectly. OWN
CHILDREN EXCLUDED

Page 3 of 3

25

THE STATE OF TEXAS

VS.

~~Boo~~ Suchil
Benjamin

CAUSE NO. F **21-00572** -J

CRIMINAL     DISTRICT COURT No. **2**

DALLAS COUNTY, TEXAS

**FILED**
21 DEC -1  AM 10: 25
FELICIA PITRE
DISTRICT CLERK
DALLAS CO TX
___ Venable 2

## PLEA AGREEMENT

State ID No: _____     Incident No / TRN: _____

Attorney for State: **Kelley**     Attorney for Defendant: **F Clinton Broden**

Offense: ~~Intoxicatory~~ Injury to child _____

Statute for Offense: _____     Charging Instrument: [ ] Indictment  [X] Information

Date of Offense: **8/15/17**     Degree of Offense: **3rd Degree**

Affirmative finding of deadly weapon: [ ] YES [X] NO     Type of Weapon: _____

Affirmative finding of family violence: [ ] YES [X] NO     Ignition Interlock required [ ] YES [X] NO

Affirmative finding of bias or prejudice: [ ] YES [X] NO     If yes, Group: _____

Sentence to run [ ] CONCURRENTLY [ ] CONSECUTIVELY WITH _____

Time Credit: From _____ To _____     From _____ To _____

Sex Offender Registration [ ] DOES [X] DOES NOT apply.     Age of victim at time of offense: _____

**TO THE HONORABLE JUDGE OF SAID COURT:**

The defendant herein and the attorneys for both the defendant and the State waive a jury trial and make the following agreement:

| | | | | |
|---|---|---|---|---|
| Defendant's Plea: | [X] | Guilty | [ ] | Nolo contendere |
| | [ ] | Defendant will testify. | [ ] | Defendant will not testify |

| | | | | |
|---|---|---|---|---|
| Plea to enhancement paragraph(s): | [ ] | True | [ ] | Not true |
| Type of Plea: | [ ] | Plea bargain | [ ] | Open plea |

Open as to:  [ ] Fine  [ ] Restitution  [ ] Community Supervision  [ ] Deferred Adjudication
[ ] Other

**State's recommendation:**

Agreed sentence:

[ ] Confinement in [ ] penitentiary [ ] state jail [ ] county jail for _____ [ ] years [ ] months [ ] days

[ ] Post-conviction community supervision, confinement probated for _____ [ ] years [ ] months [ ] days

[X] Deferred community supervision for **5** [X] years [ ] months [ ] days

[X] Fine of $ **1,500** [ ] to be paid [X] to be probated

[ ] Boot Camp [ ] Shock Probation [ ] Substance Abuse Felony Program

[ ] CENIKOR [ ] Judicial Treatment Center [ ] Dallas County Jail Chemical Dependency Program

[ ] Restitution in the amount of $ _____

[ ] Defendant will sign waiver of extradition [X] Defendant knowingly and voluntarily waives appeal

[ ] Defendant Waives a court reporter     [X] Other: **No contact w/ victim**

[ ] Back-time included: _____     [ ] Back time NOT included

- No sex offender Conditions
- Can maintain employment at Center stage Floors
- Dismissal of F15-468288

26

☐ **CHANGE OF NAME** *(Applicable only if box is checked)*

The defendant having suggested that his/her true name is other than that set forth in the charging instrument, and having moved that the charging instrument and all other documents in this cause be amended to show his/her true name to be_____ , said motion is hereby granted. It is so ordered.

## COURT'S ADMONITIONS TO DEFENDANT

You are charged with the offense of: _Injury to child_____

The punishment range for the offense charged is:

☐ 1st Degree Felony, 5-99 years or Life and an optional fine not to exceed $10,000.00
☐ 2nd Degree Felony, 2-20 years confinement and an optional fine not to exceed $10,000.00
☒ 3rd Degree Felony, 2-10 years confinement and an optional fine not to exceed $10,000.00
☐ State Jail Felony, 180 days – 2 years State Jail and an optional fine not to exceed $10,000.00
☐ _____

You have an absolute right to a jury trial, to confront and cross-examine the witnesses against you, and to call witnesses in your own behalf. You have a right to testify, but you cannot be compelled to do so. The prosecuting attorney's recommendation as to punishment is not binding on the Court. If the Court rejects any plea bargain made in this case, you may withdraw your plea of guilty or *nolo contendere*. If the punishment assessed by the Court is not greater than that which you have plea-bargained, you may not appeal on any matter in the case unless the Court grants permission for the appeal or the matters appealed were raised by written motion filed and ruled on before the plea. If you enter a plea of guilty or *nolo contendere* and there is no plea bargain, the court may assess your punishment anywhere within the range allowed by law. If you are not a citizen of the United States, a plea of guilty or *nolo contendere* may, and under current Federal Immigration rules *is almost certain to*, result in your deportation, removal, exclusion from admission to the United States, or denial of naturalization. If you have a court-appointed attorney, you have a right to ten days from the date of the attorney's appointment to prepare for trial. You have the right to be tried on an indictment returned by a Grand Jury, and, unless you are on bond, a right to two entire days after being served with a copy of the charging instrument before being arraigned. If you receive unadjudicated community supervision and violate its conditions, you may be arrested and subjected to a hearing limited to determining whether or not guilt should be adjudicated. If guilt is adjudicated the full range of punishment is open to the Court. All proceedings, including assessment of punishment, pronouncement of sentence, granting of community supervision, and an appeal, then continue as if the adjudication of guilt had not been deferred. [In sex offense cases, see Court's Admonition to Sex Offenders, which is incorporated by reference and attached hereto.]

## DEFENDANT'S STATEMENTS AND WAIVERS

With the approval of counsel, defendant makes the following statements and waivers. I am the accused in the charging instrument and am mentally competent. I understand the nature of the accusation made against me, the range of punishment for such offense, and the consequences of a plea of guilty or *nolo contendere*. I understand that I have an absolute right to a jury trial, that I have the right to remain silent, that anything I say can and will be used against me, that I have the right to confront and cross-examine the witness against me, and that I have a right to be tried upon an indictment returned by a grand jury. I understand that if

27

I am not a United States citizen, a plea of guilty or *nolo contendere* will probably result in my deportation from the United States, exclusion from admission to the United States, or denial of naturalization under Federal law.

I hereby waive my right to be tried on an indictment returned by a grand jury; any and all defects, errors, or irregularities, whether of form or substance, in the charging instrument; my right to a jury trial; and my right to remain silent. I waive arraignment and reading of the charging instrument; the appearance, confrontation, and cross-examination of witnesses on the issues of guilt and punishment; my right to ten days to prepare for trial after the appointment of counsel (if counsel has been appointed); and the preparation of a pre-sentence report. I consent to the oral or written stipulation of evidence or testimony, to the introduction of testimony by affidavits or written statements of witnesses, and to all other documentary evidence.

I admit and judicially confess that I committed the offense of ___Injury to a Child___ on ___8/15/17___, exactly as alleged in the charging instrument. I affirm that my plea and judicial confession are freely and voluntarily made, and not influenced by any consideration of fear, persuasion, or delusive hope of pardon or parole.

I understand the admonitions regarding unadjudicated community supervision, and that I will be required to register as a sex offender if convicted of, or placed on community supervision for, one of the offenses enumerated under Court's Admonition to Sex Offenders, attached hereto. I understand that under the Uniform Extradition Act, should I be charged with a violation of my community supervision and be arrested in another state, I have the right to require the issuance and service of a warrant of extradition, the right to hire legal counsel, or, if indigent, to have counsel appointed, and the right to apply for a writ of habeas corpus to contest my arrest and return to this State.

☑ I voluntarily and knowingly waive my rights under the Extradition Act, waive extradition, and waive my right to contest my return to the State of Texas from any jurisdiction where I may be found. I understand and agree that such waiver is irrevocable.

☑ I understand that I have a right to appeal to the Court of Appeals. After consulting with my attorney, I do expressly, voluntarily, knowingly, and intelligently give up and waive my right to any appeal if the Court follows the terms of the State's recommendation as to sentencing.

☑ I waive and give up my right to have a court reporter make a record of these court proceedings as provided by Rule 13.1 of the Texas Rules of Appellate Procedure.

☐ **DEFENDANT'S PLEA TO ENHANCEMENT PARAGRAPH(S) (Applicable only if box is checked)**
I, the defendant, plead true to the enhancement allegations included in the:
☐ first      ☐ second      ☐ first & second
enhancement paragraph(s) which is/are contained in the charging instrument or the State's Notice of Enhancement, and judicially confess that I am the same person who was previously duly and legally convicted of the offense(s) alleged therein.

28

# SIGNATURES AND ACKNOWLEDGMENTS

I, the defendant herein, acknowledge that my attorney has explained to me, and I have read and I understand, all the foregoing admonitions and warnings regarding my rights and my plea, and that my statements and waivers are knowingly, freely, and voluntarily made with full understanding of the consequences. I request that the Court accept all my waivers, statements, agreements, and my plea.

2021 11 17

Date

_____
Defendant

Suchil, Benjamin
_____
Printed Name

I have consulted with the defendant, whom I believe to be competent, concerning the plea in this case and have advised the defendant of his/ her rights. I approve and agree to all waivers, statements, and agreements of the defendant herein and ask the Court to accept them and the defendant's plea.

11/17/21
_____
Date

_____
Attorney for Defendant

2400 1495
_____
State Bar Number

F Clinton Broden
_____
Printed Name

As attorney for the State, I hereby consent to and approve the requests, waivers, agreements, and stipulations in this instrument.

11/17/21
_____
Date

JOHN C CREUZOT, Criminal District Attorney, Dallas County

_____
Assistant District Attorney

24046194
_____
State Bar Number

G. Kelbe
_____
Printed Name

It appearing to the Court that the defendant is mentally competent and is represented by counsel, that the defendant understands the nature and consequences of the charge, and that all the parties have consented to and approved the waiver of jury trial and stipulations of evidence, the Court finds the waivers, agreements, and plea to have been knowingly, freely, and voluntarily made, approves the waivers and agreements, accepts the defendant's plea, approves the stipulation of testimony, and approves the change of name contained herein (if applicable).

12/1/21
_____
Date

_____
Judge

29