IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DFW DANCE FLOORS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-CV-01775-N |
| | § | |
| BENJAMIN SUCHIL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

This Order addresses Defendants Benjamin Suchil and Imperial Floors, LLC's ("Imperial") motion for summary judgment [283] and Plaintiff DFW Dance Floors, LLC d/b/a Center Stage's ("Center Stage") motion for summary judgment as to all counterclaims [301]. For the following reasons, the Court grants in part and denies in part both motions.

## I. ORIGINS OF THE DISPUTE

This dispute involves two specialty dance floor companies. John Christen Soiset owns Plaintiff Center Stage. Defs.' Mot. App. 001 [287]. And Defendant Suchil owns Defendant Imperial. *Id.* at 478.

Soiset founded Center Stage in 2013. *Id.* at 001. He created a dance floor panel manufacturing process for Center Stage "to produce precisely-sized modular, portable dance floor panels with low-cost machinery on a small scale, and allow for interchangeable, customizable, and reusable surfaces that may withstand temperature and other

environmental changes." *Id*. at 056.  Center Stage asserts that the panel manufacturing process is a trade secret.  Pl.'s Resp. App. 010 [330].

Suchil began working for Center Stage in 2014.  Defs.' Mot. App. 345.  Center Stage promoted him to Operations Manager in 2018.  *Id.*  As Operations Manager, Suchil oversaw sales, scheduled deliveries and removals, ordered materials, directed employees in the production of dance floors, and interfaced with customers.  *Id.* at 345–47.  In this role, Suchil had access to Center Stage's customer list, which includes the names, phone numbers, and email addresses of over 2,500 of Center Stage's clients.  *See* Pl.'s Resp. App. 012, 025–63.  Center Stage asserts that the customer list is a trade secret.  *Id.* at 010.

In 2021, Suchil pled guilty to and was placed on probation for a crime unrelated to his employment at Center Stage.  Defs.' Mot. App. 481; *see also* Pl.'s Third Am. Compl. ¶ 37, Ex. 3 [302].

In the spring of 2022, Suchil decided that he "either wanted to purchase Center Stage or start [his] own business."  Defs.' Mot. App. 482.  He presented Soiset with a Purchase of Business Agreement (the "Agreement") in April 2022.  *Id.* at 482, 173–88.  On April 20, Soiset sent Suchil a version of the Agreement with several handwritten notes and a signature on the last page with a note stating, "signed in good faith in anticipation of execution in presence of notary with seal."  *Id.* at 173–88.  The Agreement includes a section titled "Conditions Precedent to be Performed by the Seller."  *Id.* at 181.  One such condition is that "the Seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations . . . that are required . . . for the proper execution of this Agreement and transfer of the Assets to the

MEMORANDUM OPINION AND ORDER – PAGE 2

Purchaser." *Id.* Soiset testified that he did not meet this condition. *Id.* at 463–64 (Q: "Did you obtain and complete all of those documents listed in 'b'?" A: "No. I did not.").

Then, on April 22, 2022, Suchil launched Imperial. *Id.* at 478. Imperial "provides services for the events industry including portable dance floors, staging, facades, aisles/runners, and other items." *Id.* Several Center Stage employees left Center Stage and began to work for Imperial. *See* Pl.'s Resp. App. 097–98, 145. Moreover, Imperial possesses several floor panels, carts, and casters that resemble panels, carts, and casters that Center Stage claims it is missing. *See* Pl.'s Mot. Sanctions App. 051–58, 081–82, 096, 197, 204–08, 229–35 [304]; *see also* Defs.' Mot. App. 219, 226–30.

In late May 2023, Imperial had a job at Dallas Country Club ("DCC") to assemble a dance floor for a wedding. Def.'s Resp. App. 004 [329-1]. For this job, Imperial used panels that it had purchased from Maria Gossard in 2022 and panels that Suchil had acquired while he worked for Center Stage. Pl.'s Mot. App. 021 [301-2]; Def.'s Resp. App. 004, 007–09. Regarding the panels he acquired while at Center Stage, Suchil says that he took them from Center Stage's trash, Def.'s Resp. App. 004; Pl.'s Mot. App. 017, while Center Stage asserts that Soiset directed Suchil to put the panels back into circulation for use by Center Stage and did not direct anyone to throw them away. Soiset Decl. (Feb. 4, 2025) ¶¶ 8–9, 16–17 [299]. Imperial's client was not satisfied with Imperial's dance floor, so the client called Suchil to request he change the dance floor before the event that night. Pl.'s Mot. App. 007–08. The client could not reach Suchil, so she called Soiset and asked if Center Stage could change the dance floor. *Id.* Soiset agreed and disassembled Imperial's dance floor. *Id.* He thought that at least some of the panels Imperial had used

actually belonged to Center Stage and took them off the DCC premises the next day.  *Id.*;
*see also* Soiset Decl. ¶¶ 32–33.  Suchil did not consent to Center Stage removing the panels,
as well as trim and acrylic, from DCC.  Def.'s Resp. App. 004.  Soiset filed a police report
for theft of the property.  Pl.'s Mot. App. 008–09; *see also* Pl.'s Resp. App. 042–54.  Center
Stage has retained possession of the panels it took from DCC.  Pl.'s Mot. App. 009–10.

Center Stage brings several causes of action against Defendants, including
(1) misappropriation of trade secrets in violation of the Defend Trade Secrets Act
("DTSA") against Suchil and Imperial; (2) misappropriation of trade secrets in violation of
the Texas Uniform Trade Secrets Act ("TUTSA") against Suchil and Imperial; (3) breach
of fiduciary duty against Suchil; (4) fraud against Suchil; (5) breach of contract against
Suchil; (6) violation of the Texas Theft Liability Act ("TTLA") against Suchil and
Imperial; (7) tortious interference with a contract against Suchil;  and (8) unjust enrichment
against Suchil.  Pl.'s Third Am. Compl. ¶¶ 46–90.  Defendants now move for summary
judgment on all Center Stage's claims.  Defs.' Mot. Br. 1 [286].

Additionally, Imperial brings two counterclaims against Center Stage involving the
property Center Stage took from DCC, including claims for civil conversion and violation
of TTLA.  Def.'s Counterclaims ¶¶ 96–111 [147-2].  Imperial also brings a counterclaim
titled "Further Requested Relief: Bad Faith Under the Defend Trade Secrets Act," arguing
that it is entitled to attorney's fees for Center Stage's DTSA claim because Center Stage
brought the DTSA claim in bad faith.  *Id.* ¶¶ 112–22.  Center Stage now moves for
summary judgment on all Imperial's counterclaims.  *See* Pl.'s Mot. Br. 3 [301-1].

MEMORANDUM OPINION AND ORDER – PAGE 4

## II. THE COURT SUSTAINS IN PART DEFENDANTS' EVIDENTIARY OBJECTIONS

Defendants make numerous objections to Center Stage's summary judgment evidence.[1] *See generally* Defs.' Objections [339].

Under Federal Rule of Civil Procedure 56(c)(4), an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4).  District courts may strike declarations that do not comply with Rule 56's standards. *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 530 (5th Cir. 1992).  Further, under the sham affidavit doctrine, "a district court may refuse to consider statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'" *Winzer v. Kaufman County*, 916 F.3d 464, 472 (5th Cir. 2019) (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)). But there is no sham when an inconsistency can be reconciled. *See id.* at 472–73.

First, Defendants object to paragraph 23 of Soiset's declaration as sham testimony and argue that it should be excluded under Federal Rule of Evidence 403.  Defs.' Objections ¶ 2.  In this paragraph, Soiset states that he believes Defendants misappropriated Center Stage's customer list and panel manufacturing process, which he claims are trade secrets.  Pl.'s Resp. App. 010.  Soiset previously testified that Center Stage's trade secrets consist of more categories of information than what he identified in paragraph 23.  The

[1] The Court declines to rule on objections to evidence that the Court does not rely on in deciding the motion for summary judgment and declines to rule on objections when, even assuming the objected-to statements are admissible, the objected-to statements fail to raise a genuine issue of material fact.

MEMORANDUM OPINION AND ORDER – PAGE 5

Court does not find that this difference is so inconsistent as to constitute an obvious sham, so the Court overrules the sham-testimony objection. The Court also overrules the Rule 403 objection. *See, e.g.*, *Talley v. City of Austin*, 2024 WL 5159912, at *5 (W.D. Tex. 2024) ("Rule 403 does not apply at the summary judgment stage." (citing *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981))).

Next, Defendants object to paragraph 42 of Soiset's declaration as conclusory and lacking personal knowledge. Defs.' Objections ¶ 17. The Court agrees and strikes the following statements in paragraph 42: (1) "I know that Defendants are using the Customer List," (2) "Defendants used Center Stage's customer list to purchase or attempt to purchase Center Stage manufactured floor panels from Center Stage's customers," (3) "Defendants could have only known about [Gossard Designs and Alliant] through Center Stage and could only have received their contact information from Center Stage's Customer List," and (4) "Thus, the only way Defendants could have learned [Ann Pittman's] contact information was through the Customer List."

Defendants also object to paragraph 43 of Soiset's declaration as conclusory and lacking personal knowledge. Defs.' Objections ¶ 18. The Court agrees and strikes the following statements in paragraph 43: (1) "I know that Defendants are using my methods of manufacturing floor panels because they are using my three extrusion designs," (2) "Alex Sanchez was clearly trying to copy what he learned from me to use with Imperial," and (3) "They could never had made any floor panels, remotely similar to Center Stage's, without at least some knowledge of the Panel Manufacturing Process."

Defendants then object to paragraph 56 of Soiset's declaration as lacking personal knowledge. Defs.' Objections ¶ 31. The Court strikes the following statements in paragraph 56 on this ground: (1) "I believe all of Suchil's business has been diverted improperly from Center Stage," and (2) "if [Suchil] did not have the Customer List, he could not have built such a successful business so fast."

Defendants also object to part of paragraph 57 of Soiset's declaration as conclusory and lacking personal knowledge. *See* Defs.' Objections ¶ 32. The Court agrees and strikes the following portion of paragraph 57: "Suchil's representations regarding his intent to purchase Center Stage were clearly false, because he did not have the means to purchase Center Stage and was already in the process of forming and operating Imperial."

Next, Defendants object to paragraph 58 of Soiset's declaration as conclusory and lacking personal knowledge. Defs.' Objections ¶ 33. The Court agrees and strikes the entirety of paragraph 58.

Lastly, Defendants object to the following portion of paragraph 60 of Soiset's declaration as sham testimony: "Center Stage performed all its parts of the bargain as stated in the purchase and sale agreement and the tasks required up to closing date (i.e., the final sale)." Defs.' Objections ¶ 35. Soiset previously testified that Center Stage did not satisfy all of the conditions precedent to Suchil's performance under the Agreement. *See* Defs.' Mot. App. 463–64. Thus, to the extent that Soiset means in paragraph 60 that Center Stage fulfilled all conditions precedent, the Court strikes this statement as directly contradicting his deposition testimony.

### III. SUMMARY JUDGMENT LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Bargher v. White*, 928 F.3d 439, 444 (5th Cir. 2019) (citation omitted). Factual controversies are resolved in favor of

the nonmoving party "only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999).

### IV. THE COURT GRANTS IN PART AND DENIES IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Center Stage's claims. *See* Defs.' Mot. Br. 1. The Court analyzes each of Center Stage's claims in turn.

#### A. *Trade Secret Misappropriation Standard*

DTSA and TUTSA prohibit unlawful misappropriation of trade secrets. *See* 18 U.S.C. § 1836(b); TEX. CIV. PRAC. & REM. CODE § 134A.002. Except for the interstate commerce requirement of DTSA, the elements and relevant statutory definitions of DTSA and TUTSA claims are similar. *Phazr, Inc. v. Ramakrishna*, 2020 WL 5526554, at *3 (N.D. Tex. 2020) ("A substantial number of provisions in the two statutes — including the definition of 'trade secret' — are 'either identical or very similar in many respects.'" (quoting *StoneCoat of Tex., LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 333 (E.D. Tex. 2019))).

"To prevail on a misappropriation of trade secrets claim, 'a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant *used* the trade secret without authorization from the plaintiff.'" *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318, 325 (5th Cir. 2018) (emphasis in original) (quoting *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 273 (5th Cir. 2009)); *see also Frank Surveying Co. v. Harp*, 2024 WL

3625670, at *3 (N.D. Tex. 2024) (citing 18 U.S.C. § 1836(b)(1)). A plaintiff must also prove "the trade secret's relation to a good or service used in or intended for use in interstate or foreign commerce" to prevail on a DTSA claim. *Harp*, 2024 WL 3625670, at *3. DTSA and TUTSA define "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); *see also* TEX. CIV. PRAC. & REM. CODE § 134A.002(6). Whether a trade secret exists is a question of fact. *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022).

A "plaintiff must show that a defendant actually used its trade secrets to succeed on a misappropriation claim." *Providence Title Co. v. Truly Title, Inc.*, 732 F. Supp. 3d 656, 667 (E.D. Tex. 2024). "As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a use." *GE Betz*, 885 F.3d at 326 (citation and internal quotation marks omitted); *see also Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) ("Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret."). As such, a "mere showing of improper acquisition is insufficient to establish use." *Providence Title*, 732 F. Supp. 3d at 669. Moreover, a defendant's success does not

demonstrate that the defendant used the plaintiff's trade secrets. *See GE Betz*, 885 F.3d at 326–27; *CAE Integrated*, 44 F.4th at 263.

### B. *Center Stage Does Not Raise a Genuine Dispute Regarding Use of the Asserted Trade Secrets*

Center Stage claims that Defendants misappropriated its customer list and panel manufacturing process, which it asserts are trade secrets.[2] Pl.'s Third Am. Compl. ¶¶ 56, 63; Pl.'s Resp. ¶ 14 [330]. Defendants argue that Center Stage has not raised an actual fact issue regarding whether Defendants used the customer list and panel manufacturing process. Defs.' Mot. Br. 31–33; Defs.' Reply 8–12 [338]. The Court analyzes the issue of use of each of the asserted trade secrets in turn.[3]

*1. The Customer List —* Center Stage's customer list, a document listing over 2,500 of its customers' names, phone numbers, and email addresses, is one of its asserted trade secrets. *See* Pl.'s Resp. App. 025–63. Center Stage argues that its evidence that (1) Suchil had access to the customer list while he was employed at Center Stage and (2) Defendants were in contact with four of the customers included on the customer list — Pop Parties, Gossard Designs, Alliant, and Ann Pittman — raises a triable issue as to Defendants' use of the customer list. *See* Pl.'s Resp. ¶¶ 15, 58–60 (citing Pl.'s Resp. App.

---

[2] Center Stage abandoned its trade secret claims involving client sales, vendor, supplier, and employee information. *See* Pl.'s Resp. App. 010 ("Center Stage is not pursuing claims of misappropriation of the following in this litigation: client sales information; vendor and supplier information; employee information; or topping application."). As such, the Court dismisses the trade secret misappropriation claims involving client sales, vendor, supplier, and employee information.

[3] The Court does not decide whether Center Stage's alleged trade secrets qualify as "trade secrets" because summary judgment is appropriate on other grounds.

015, 090–91).  The Court finds that Center Stage's evidence does not raise a triable issue on this element.

As an initial matter, although Suchil had access to the customer list while he was employed at Center Stage, there is no evidence in the record that he downloaded or otherwise sent the list to himself at any time, much less around the time of his resignation.

Moreover, Center Stage points to no evidence showing how Defendants acquired the four customers' contact information other than the fact that Suchil had access to the customer list while he was employed at Center Stage and the insinuation that he must have taken their contact information from the customer list.  First, regarding Pop Parties, the evidence in the record shows that Pop Parties contacted Suchil about purchasing a dance floor, not that Suchil initiated contact with Pop Parties.[4]  *See* Pl.'s Resp. App. 115–17. Second and third, regarding Gossard Designs and Alliant, Center Stage points to no evidence related to how Suchil acquired their contact information other than Soiset's statement that neither "Gossard Designs nor Alliant published their floor panels for sale." *Id.* at 015.  But this fact does not reasonably support an inference that Defendants acquired Gossard Designs' or Alliant's contact information from the customer list.   Fourth, regarding Pittman, Center Stage points to evidence that at the time Suchil sent Pittman an email, "Pittman did not publish her contact information." *Id.* at 016, 090–91.  However,

---

[4]  Center Stage also submits evidence of texts between Suchil and Molly Rasmussen, owner of Pop Parties.  *See* Pl.'s Resp. App. 110–14.  However, the phone number on this text thread does not match the phone number listed for Pop Parties on Center Stage's customer list, so the text thread does not suggest that Suchil got this phone number from Center Stage's customer list.  *Compare id.* at 110–14 *with id.* at 052.

this alone does not create a triable issue because Pittman is an "industry client" and thus there are several ways Defendants could have gotten her contact information without using the customer list.  *See* Defs.' Mot. App. 364.

The Court thus concludes that the evidence, viewed in the light most favorable to Center Stage, does not raise a genuine issue regarding whether Defendants used the customer list.  Accordingly, the Court grants Defendants' motion for summary judgment on the trade secret misappropriation claim involving the customer list.

*2.*  ***The Panel Manufacturing Process — *** Center Stage states that the "compilation of steps" constituting its panel manufacturing process constitutes a trade secret.  Pl.'s Resp. ¶ 18.  The panel manufacturing process "is the process of adding the metal trim to the wood base in a way that stabilizes the floors, can withstand the elements, and permits a replaceable topping."  *Id.* ¶ 17.  The steps of the panel manufacturing process are described in Soiset's expert report.  *See* Defs.' Mot. App. 056–60.

Center Stage points to the fact that Suchil learned how to manufacture floor panels from Soiset as evidence that Defendants used the panel manufacturing process.  Pl.'s Resp. ¶ 62.  But the fact that he learned Center Stage's process while an employee there does not reasonably support the inference that Suchil later used Center Stage's panel manufacturing process while running Imperial.

Next, Center Stage asserts that the fact that Suchil took photos of Center Stage's floor panel trim while employed at Center Stage is evidence that he later used the panel manufacturing process at Imperial.  *Id.* ¶ 62; *see also* Pl.'s Resp. App. 092–93.  To the extent that Center Stage argues that Suchil's taking photos of the trim is by itself evidence

of use, the Court rejects this argument.  *See GE Betz*, 885 F.3d at 327 (finding that evidence as to the circumstances under which the defendant allegedly obtained the trade secret is not evidence of actual use of the trade secret).  And the only evidence that Center Stage points to as showing that Defendants used Suchil's photos of the floor panel trim to reverse engineer and use Center Stage's panel manufacturing process is an email thread and receipt showing that Imperial ordered trim from Eastern Metal Supply, Inc. ("Eastern Metal") in August 2022.  *See* Pl.'s Resp. App. 195–205.  However, Center Stage presents no evidence showing that the type of trim Imperial ordered from Eastern Metal is the same kind or size of trim as that used in Center Stage's panel manufacturing process.  Accordingly, this evidence does not raise a triable issue of Defendants' use of the panel manufacturing process.

Center Stage also represents that "Defendants admit that they made changes to the Panel Manufacturing Process."  Pl.'s Resp. ¶ 62.  However, this mischaracterizes Defendants' statement.  Instead, Defendants stated, "Imperial Floors's extrusions are different than Center Stage's because Alex Sanchez purposefully designed Imperial Floors's differently."  Defs.' Mot. Br. 31.  The Court finds that Defendants intentionally creating a different manufacturing process is not evidence that Defendants used Center Stage's panel manufacturing process.

Then, Center Stage points to paragraph 45 of Soiset's declaration, in which he states that he observed that Defendants use "the same adhesive and pipe clamps" as Center Stage and that Defendants "use a variation on the type of wood" that Center Stage uses.  Pl.'s Resp. ¶ 62 (citing Pl.'s Resp. App. 017).  Evidence that a defendant uses "manufacturing

equipment and tools" in its manufacturing process that are "identical to those employed by" a plaintiff can constitute evidence that the defendant is misappropriating a trade secret. *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994). Here, however, Center Stage's evidence does not show that Defendants used manufacturing tools and equipment that are identical to those Center Stage employs in its panel manufacturing process. First, regarding the adhesive, Soiset testified that the adhesive referenced in the panel manufacturing process is a commercially available glue and is commonly used in construction, *see* Defs.' Mot. App. 385, so use of the same adhesive alone does not show use of the trade secret. Second, regarding the pipe clamps, Center Stage's panel manufacturing process does not mention pipe clamps, *see* Defs.' Mot. App. 056–60, so Defendants' use of pipe clamps does not suggest use of identical tools or use of the trade secret. Third, regarding the wood, Center Stage represents that its process involves a "specific type of high-quality plywood panel," *id.* at 056, but Soiset observed that Defendants use a different type of wood. *Id.* at 017. Accordingly, the fact that Defendants use a different type of wood than Center Stage does not support that Defendants use identical materials or otherwise use Center Stage's panel manufacturing process. Thus, Soiset's observations in paragraph 45 do not raise a triable issue regarding Defendants' use of the panel manufacturing process.

Center Stage also argues that Defendants' pleadings in a related case constitute an admission that they used the panel manufacturing process. Pl.'s Resp. ¶ 63. In the related case, Defendants stated that "Imperial Floors was unable to purchase [Center Stage] dance floor panels" and had "to purchase or otherwise manufacture replacement dance floor panels." Pl.'s Resp. App. 080–81. Defendants' statement that they had to manufacture

replacement panels does not reasonably imply that Defendants used Center Stage's panel manufacturing process to do so.

Additionally, Center Stage asserts that Defendants have used the portion of its panel manufacturing process involving "smoked mirror" artwork.  Pl.'s Resp. ¶ 64.  However, Center Stage does not identify evidence supporting this assertion, so the Court declines to find a triable issue as to use on this ground.

In sum, Center Stage has not raised a genuine dispute as to whether Defendants used the compilation of steps constituting Center Stage's panel manufacturing process. Accordingly, the Court grants Defendants' motion for summary judgment on the trade secret misappropriation claim involving the panel manufacturing process.

### C.  Standard for TUTSA Preemption

Next, Defendants assert that TUTSA preempts Center Stage's breach of fiduciary duty, TTLA, tortious interference, and unjust enrichment claims.  Defs.' Mot. Br. 33.

TUTSA's preemption provision "displaces conflicting tort, restitutionary, and other law of [Texas] providing civil remedies for misappropriation of a trade secret."  TEX. CIV. PRAC. & REM. CODE § 134A.007(a).  The preemption provision does not apply to contractual remedies or other civil claims not based upon misappropriation of a trade secret.  *Id.* § 134A.007(b)(1)–(2).  The "plain language of the preemption provision indicates that the law was intended to prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret."  *Super Starr Int'l, LLC v. Fresh Tex*

*Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App. — Corpus Christi 2017, no pet.) (quoting

*Smithfield Ham & Prod. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995)).

"A common law claim is preempted by TUTSA 'when the gravamen of the common

law claim duplicates a TUTSA claim.'" *Caliber Home Loans, Inc. v. Cove*, 2025 WL

71983, at *5 (N.D. Tex. 2025) (cleaned up) (quoting *Title Source, Inc. v. HouseCanary,*

*Inc.*, 612 S.W.3d 517, 533 (Tex. App. — San Antonio 2010, pet. denied)). Most "district

courts in Texas hold that if a plaintiff's tort claim is premised on the same factual

allegations as its claim for trade secret misappropriation, the claim is preempted by

TUTSA." *Id.* at *6 (citation omitted); *see also WeInfuse, LLC v. InfuseFlow, LLC*, 2021

WL 1165132, at *6 (N.D. Tex. 2021) ("The focus of preemption is not whether some other

recognized tort duty can be identified, but whether the facts relied on to support that tort

duty differ from those facts supporting the TUTSA claim."). However, a "claim is not

preempted if the plaintiff is able to show the claim is based on facts unrelated to the

misappropriation of the trade secret." *360 Mortg. Grp., LLC v. Homebridge Fin.*

*Servs., Inc.*, 2016 WL 900577, at *6 (W.D. Tex. 2016).

### D. Defendants are Entitled to Summary Judgment on Part of Center Stage's Breach of Fiduciary Duty Claim

First, Defendants argue that Center Stage's breach of fiduciary duty claim against

Suchil is preempted by TUTSA. Defs.' Mot. Br. 34–35. The breach of fiduciary duty

claim is premised on Suchil's alleged (1) misappropriation of trade secrets,

(2) nondisclosure of his probation, (3) solicitation of Center Stage's employees while he

was still employed at Center Stage, and (4) use of Center Stage's employees to travel to

Ohio and California for Defendants' benefit. *See* Pl.'s Third Am. Compl. ¶¶ 48–49; Pl.'s Resp. ¶¶ 69, 72, 85–93. The first basis for the breach of fiduciary duty claim is premised on the same factual allegations as the TUTSA claim, so TUTSA preempts the first basis for the fiduciary duty claim. *See Super Starr*, 531 S.W.3d at 843. However, the second, third, and fourth bases for the breach of fiduciary duty claim are premised on different factual allegations than the TUTSA claim, so TUTSA does not preempt these bases for the fiduciary duty claim.

Then, Defendants argue that the breach of fiduciary duty claim based on Suchil's nondisclosure of his probation fails because he had no duty to disclose his probation. *See* Defs.' Mot. Br. 37–38. Under Texas law, "the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). "When a fiduciary relationship exists between an employer and employee, the employee has a duty to act primarily for the employer's benefit, not to compete against the employer, to deal fairly with the employer, and to fully disclose to the employer information about matters affecting the company's business." *Stress Eng'g Servs., Inc. v. Olson*, 2022 WL 4086574, at *5 (S.D. Tex. 2022), *report and recommendation adopted*, 2022 WL 4084433 (S.D. Tex. 2022). Here, Center Stage has not submitted evidence that Suchil's probation is a matter affecting Center Stage's business, so Center Stage has not raised a triable issue of whether Suchil breached his fiduciary duty by not disclosing the probation. Moreover, even assuming Center Stage raised a triable issue regarding the breach element, Defendants submitted evidence

showing that Center Stage did not suffer damages based on Suchil's nondisclosure of the probation. *See* Defs.' Mot. App. 471 (Q: "Nothing about his failure to tell you [about his probation] caused you in the past to lose any business, lose any sales, having problems out on his jobs? Right?" A: "Business or sales, no, I did not lose business or sales from that."). Thus Center Stage did not raise evidence creating an actual controversy on the issue of damages caused by Suchil's nondisclosure. Accordingly, the Court grants Suchil summary judgment on the part of the breach of fiduciary duty claim premised on Suchil's nondisclosure of his probation.

Defendants do not make additional arguments as to why the Court should grant summary judgment on the parts of the fiduciary duty claim based on Suchil's alleged solicitation of Center Stage's employees and use of Center Stage's employees to travel to Ohio and California for Defendants' benefit, so the Court denies summary judgment on these parts of the breach of fiduciary duty claim.

### E. Defendants are Entitled to Summary Judgment on Part of Center Stage's TTLA Claim

Next, Defendants argue that Center Stage's TTLA claim is preempted by TUTSA. Defs.' Mot. Br. 36. In support of its TTLA claim, Center Stage alleges that Defendants "unlawfully appropriated Center Stage's property" but do not specify what kind of property Defendants unlawfully appropriated. *See* Pl.'s Third Am. Compl. ¶¶ 75–79. In its response brief, Center Stage states that in addition to stealing Center Stage's trade secrets, Suchil also stole Center Stage's floor panels, carts, and casters. Pl.'s Resp. Br. ¶¶ 75, 108. Thus, to the extent Center Stage premises its TTLA claim on alleged theft of its trade secrets,

MEMORANDUM OPINION AND ORDER – PAGE 19

such a basis is preempted by TUTSA.  However, to the extent Center Stage premises its TTLA claim on alleged theft of its floor panels, carts, and casters, this basis is not preempted by TUTSA.

Defendants next assert that Center Stage does not raise a genuine dispute regarding whether Defendants unlawfully appropriated the floor panels, carts, and casters.  Defs.' Mot. Br. 46–48.  Under TTLA, "a person who commits theft is liable for the damages resulting from the theft."  *Jafar v. Beach & Beaches, Inc.*, 2024 WL 3107684, at *2 (Tex. App. — Houston [1st Dist.] 2024, no pet.) (mem. op.) (unpub.) (citing TEX. CIV. PRAC. & REM. CODE § 134.003(a)).  "Theft" in this context means "unlawfully appropriat[ing] property with intent to deprive the owner of property."  TEX. PENAL CODE § 31.03(a). Here, Center Stage has presented evidence suggesting that Defendants possess the carts and casters that Center Stage is missing.  Several people observed that Defendants were using carts and casters that look similar to the carts and casters Center Stage claims it is missing, *see*  Pl.'s Mot. Sanctions App. 81–82, 96, 197, 204–08, 229–35, and Soiset stated that he knows "of no other company that modifies their carts in the way that Center Stage modifies its carts."  Soiset Decl. ¶ 26.  Moreover, there is conflicting evidence about whether Suchil unlawfully appropriated the floor panels as it is unclear if, when Suchil worked at Center Stage, Soiset directed him to discard the panels at issue or to put them back into circulation at Center Stage.  *See* Pl.'s Mot. Sanctions App. 51–58; Def.'s Resp. App. 004.  This evidence is enough to raise a triable issue regarding whether Defendants unlawfully appropriated Center Stage's property with intent to deprive Soiset of the

MEMORANDUM OPINION AND ORDER – PAGE 20

property.  Accordingly, the Court denies Defendants' motion for summary judgment on the TTLA claim regarding Center Stage's floor panels, carts, and casters.

### F.  TUTSA Preempts Center Stage's Tortious Interference Claim

Defendants also assert that Center Stage's tortious interference with a contract claim against Suchil is subject to TUTSA preemption.  Defs.' Mot. Br. 36.  The "majority position in Texas courts appears to be that tortious interference with contract is not a contractual remedy and that the TUTSA can therefore preempt such claims."  *El Paso Disposal, LP v. Ecube Labs Co.*, 766 F. Supp. 3d 692, 721 (W.D. Tex. 2025) (collecting cases).  This is because "courts generally view tortious interference with contract under Texas common law as a 'tort claim requiring the existence of a contract as an element,' as opposed to as a 'claim in contract' itself."  *Id.* (quoting *Avenu Insights & Analytics, LLC v. Azavar Gov't Sols., Inc.*, 2023 WL 3035363, at *4 (E.D. Tex. 2023)).  Here, Suchil's improper solicitation of the business of Center Stage's clients is the factual allegation relied on to support both the tortious interference and the trade secret claims.  *Compare* Pl.'s Third Am. Compl. ¶¶ 27, 41–44, 81–82 (tortious interference allegations) *with id.* ¶¶ 63, 66–67 (TUTSA allegations).  Accordingly, TUTSA preempts the tortious interference claim.

### G.  Defendants are Entitled to Summary Judgment on Part of Center Stage's Unjust Enrichment Claim

Additionally, Defendants assert that Center Stage's unjust enrichment claim against Suchil is subject to TUTSA preemption.  Defs.' Mot. Br. 36–37.  In support of the unjust enrichment claim, Center Stage alleges that Suchil "sabotaged Center Stage, stole

everything he could from Center Stage, including its employees, clients, trade secrets, and materials."  Pl.'s Third Am. Compl. ¶ 88.

The Court determines that the unjust enrichment claim is partially preempted by TUTSA.  TUTSA preempts the parts of the claim based on Suchil's alleged stealing of trade secrets and clients as these parts involve the same factual allegations as the TUTSA claim.  However, TUTSA does not preempt the parts of the unjust enrichment claim based on Suchil's alleged stealing of Center Stage's employees and materials, as these parts of the claim are premised on different factual allegations than the trade secret claim. Defendants do not make additional arguments as to why the Court should grant summary judgment on the parts of the unjust enrichment claim that are not preempted by TUTSA, so the Court denies summary judgment on these parts of the unjust enrichment claim.

### H.  Center Stage Did Not Satisfy the Conditions Precedent in the Agreement

Center Stage alleges that Suchil breached a Purchase of Business Agreement (the "Agreement").  Pl.'s Third Am. Compl. ¶¶ 72–74; *see also* Defs.' Mot. App. 173–88. Defendants argue that the Agreement is not enforceable because Center Stage has not demonstrated satisfaction of conditions precedent.  Defs.' Mot. Br. 45–46.

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation."  *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex. 1992) (collecting cases).  If "an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform."  *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010).  The "party seeking to recover under a contract bears the burden of showing that all conditions precedent to the

other party's performance of that contract have been satisfied." *Rayes v. Stantec Architecture, Inc.*, 2018 WL 4026372, at *3 (N.D. Tex. 2018) (Godbey, J.) (collecting cases).

The Agreement at issue here includes a section titled "Conditions Precedent to be Performed by the Seller," which stipulates that the "obligation of the Purchaser to complete the purchase of the Assets under this Agreement is subject to the satisfaction of the following conditions precedent by the Seller, on or before the Closing Date, each of which is acknowledged to be for the exclusive benefit of the Purchaser . . ." Defs.' Mot. App. 181. The Agreement then lists nine conditions precedent to Suchil's performance. *Id.* at 181–82. One such condition, listed in paragraph 23(b) of the Agreement, is that

> the Seller will obtain and complete any and all forms, documents, consents, approvals, registrations, declarations, orders, and authorizations from any person or governmental or public body that are required of the Seller for the proper execution of this Agreement and transfer of the Assets to the Purchaser;

*Id.* at 181. Moreover, the Agreement states that if "either Party fails to satisfy any of its conditions precedent . . . then this Agreement will be null and void and there will be no further liability between the Parties." *Id.* at 182.

Defendants submitted evidence showing that Center Stage did not satisfy all conditions precedent: at Soiset's deposition, he stated that Center Stage had not met the condition listed in paragraph 23(b) of the Agreement. Defs.' Mot. App. 463–64 (Q: "Did you obtain and complete all of those documents listed in 'b'?" A: "No. I did not."). Center Stage did not submit evidence of contradictory facts. Center Stage thus has not shown that

a genuine dispute exists as to whether it satisfied the conditions precedent.[5]  Accordingly, the Court grants Defendants summary judgment on the breach of contract claim.

### I.  *Defendants are Entitled to Summary Judgment on Center Stage's Fraud Claim*

Lastly, Defendants argue that Center Stage's fraud claim against Suchil fails.  Defs.' Mot. Br. 39–40.  Center Stage alleges that Suchil committed fraud by omission on April 20, 2022 — when Soiset and Suchil were negotiating the Agreement — by not disclosing that he (1) "did not have the means to purchase Center Stage," and (2) "had been sentenced to probation five months prior."  Pl.'s Third Am. Compl. ¶ 70.

To prove a claim for fraud by omission, Center Stage must show: (1) Suchil failed to disclose a material fact within his knowledge; (2) Suchil knew that Center Stage was ignorant of the fact and did not have an equal opportunity to discover the truth; (3) Suchil intended to induce Center Stage to take some action by failing to disclose the fact; and (4) Center Stage suffered injury as a result of acting without knowledge of the undisclosed fact. *See Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001).  In addition, Center Stage must show that Suchil had a duty to disclose the omitted fact. *Id.* at 755.

The Court holds that Defendants are entitled to summary judgment on this claim. First, Center Stage provides no evidence to support its allegation that Suchil did not have

---

[5]  Center Stage also argues that the Court should deny summary judgment on the breach of contract claim because the Court previously denied Defendants' motion for judgment on the pleadings.  Pl.'s Resp. ¶ 105 (citing Order (June 6, 2023) [72]).  This argument fails because the standards for a motion for judgment on the pleadings and for a motion for summary judgment are different. *Compare* Fed. R. Civ. P. 12(c) *with* Fed. R. Civ. P. 56(a). In considering the motion for judgment on the pleadings, the Court's review was limited to the pleadings and judicially noticed facts.

the means to purchase Center Stage.  Moreover, Center Stage does not address why Suchil would have a duty to disclose his probation in the context of negotiating the Agreement or provide evidence that his probation would constitute a material fact in this context.  Center Stage also does not provide evidence that it suffered injury as a result of acting without knowledge of Suchil's probation.  Accordingly, the Court grants summary judgment for Defendants on the fraud claim.

## V.  THE COURT GRANTS IN PART AND DENIES IN PART CENTER STAGE'S MOTION FOR SUMMARY JUDGMENT

Center Stage moves for summary judgment on all of Imperial's counterclaims.  *See* Pl.'s Mot. Br. 3.  The Court first analyzes Imperial's TTLA and conversion claims, then analyzes Imperial's claim for attorney's fees under DTSA.

### A.  *Fact Issues Preclude Judgment on the TTLA and Conversion Claims*

Imperial brings TTLA and civil conversion counterclaims against Center Stage. Def.'s Counterclaims ¶¶ 96–111.  Imperial alleges the same facts in support of its TTLA and conversion claims, namely, that Center Stage unlawfully appropriated Imperial's property — floor panels, trim, and acrylic — from DCC on May 28, 2023.  *Id.*  Center Stage argues that it is entitled to summary judgment on both claims.  Pl.'s Mot. Br. ¶¶ 21–29.

Under Texas law, a claim for conversion and a claim for violation of TTLA are comprised of nearly identical elements.  *Compare* TEX. CIV. PRAC. & REM. CODE § 134.002 (listing TTLA claim elements), *with Emerald City Mgmt., LLC v. Kahn*, 2016

WL 98751, at *23 (E.D. Tex. 2016) (listing conversion claim elements). Accordingly, the Court analyzes these claims together.

After reviewing the record, the Court determines that a fact issue exists regarding the ownership of the property at issue. Imperial submitted evidence that it purchased many of the floor panels at issue from Gossard in March 2022. *See* Def.'s Resp. App. 003—04. Moreover, as discussed *supra* Section IV(E), it is unclear whether the floor panels Suchil took while employed at Center Stage rightfully belong to Center Stage or Imperial. *See* Pl.'s Mot. Sanctions App. 51–58; Def.'s Resp. App. 004. And Imperial submitted evidence that it purchased the acrylic and trim that Center Stage took from the DCC premises. *See* Def.'s Resp. App. 004. Thus, because Imperial has raised a triable issue of whether Center Stage unlawfully appropriated Imperial's property with intent to deprive Imperial of the property, the Court denies Center Stage's motion for summary judgment on the TTLA and conversion claims.

### B. Center Stage is Entitled to Summary Judgment on the Claim for Attorney's Fees under DTSA

Defendants also raise a counterclaim for attorney's fees under DTSA, alleging that Center Stage brought its trade secret misappropriation claim in bad faith. Def.'s Counterclaims ¶¶ 112–22. Center Stage moves for summary judgment on this claim, arguing that DTSA does not provide an independent cause of action for attorney's fees, or alternatively that Imperial does not raise a genuine dispute as to whether Center Stage acted in bad faith. Pl.'s Mot. ¶¶ 30–36. In response, Imperial seems to state that its claim for

attorney's fees is not actually an independent claim but instead is only a request for attorney's fees. Def.'s Resp. 10 [329].

DTSA provides, "if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, . . . [a court may] award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D). The parties do not identify precedent from any circuit court that addresses if, under DTSA, attorney's fees can be sought through a counterclaim alleging bad faith. District courts have ruled inconsistently on this issue. Some district courts have permitted counterclaims for attorney's fees under DTSA to proceed. *See Ruby Slipper Cafe, LLC v. Belou*, 2019 WL 1254897, at *13 (E.D. La. 2019) ("Considering the lack of clear authority on the issue, the Court will permit Defendants to maintain their counterclaims for attorney's fees under DTSA . . . at this stage of the case."). However, it appears that a majority of the district courts that have addressed this issue have determined that claims for attorney's fees under DTSA are not independent causes of action and instead must be pursued through a motion. *See, e.g.*, *N.J. Deer Control, LLC v. En Garde Deer Def., LLC*, 2025 WL 216318, at *3–4 (D.N.J. 2025) (collecting cases); *Beijing Meishe Network Tech. Co. v. TikTok Inc.*, 2024 WL 4627049, at *2–3 (N.D. Cal. 2024) (collecting cases).

The Court finds the majority position persuasive for two reasons. First, the language of DTSA "cabins attorney's fees as a remedy for the prevailing party, instead of creating an independent cause of action." *Beijing Meishe Network Tech.*, 2024 WL 4627049, at *3; *see also Jane St. Grp., LLC v. Millennium Mgmt. LLC*, 2024 WL 3460987, at *3 (S.D.N.Y. 2024) ("By including the fee-shifting provision in the 'Remedies' subsection, Congress

MEMORANDUM OPINION AND ORDER – PAGE 27

evidently intended it to be a potential form of relief, not an independent basis for a claim. This is reinforced by the language of § 1836(b)(3)(D) itself . . . .").  Second, the majority position comports with Federal Rule of Civil Procedure 54(d).  Rule 54(d) provides that a "claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  FED. R. CIV. P. 54(d)(2)(A).  DTSA does not require that attorney's fees be proved at trial as an element of damages.  Instead, DTSA permits the Court to award reasonable attorney's fees to the prevailing party.  18 U.S.C. § 1836(b)(3)(D).  This suggests that a claim for attorney's fees under DTSA is more appropriately brought by way of Rule 54(d) motion after receiving relief from the Court than as an independent cause of action.  *See N.J. Deer Control*, 2025 WL 216318, at *4.

Thus, the Court grants summary judgment for Center Stage on Imperial's counterclaim for attorney's fees under DTSA.  If Imperial wishes to request attorney's fees under DTSA on the theory that Center Stage acted in bad faith in bringing its DTSA claim, Imperial may do so in the form of a Rule 54(d) motion.

## CONCLUSION

Because Defendants have shown that they are entitled to judgment as a matter of law on Center Stage's DTSA, TUTSA, tortious interference with a contract, breach of contract, and fraud claims, the Court grants Defendants summary judgment on these claims and dismisses these claims with prejudice.  The Court also grants Defendants summary judgment on the parts of the breach of fiduciary duty, TTLA, and unjust enrichment claims that are preempted by TUTSA and dismisses these parts of the claims with prejudice.

MEMORANDUM OPINION AND ORDER – PAGE 28

Additionally, the Court grants summary judgment on the part of the breach of fiduciary duty claim involving Suchil's probation and dismisses this part of the claim with prejudice. However, because genuine disputes of material fact exist regarding the remaining parts of the breach of fiduciary duty claim, and the parts of the TTLA and unjust enrichment claims that are not preempted by TUTSA, the Court denies Defendants' motion for summary judgment on these parts of the claims.

Additionally, because genuine disputes of material fact exist regarding Imperial's TTLA and conversion counterclaims, the Court denies Center Stage's motion for summary judgment on these claims. However, because Center Stage has shown it is entitled to judgment as a matter of law on the counterclaim for attorney's fees under DTSA, the Court grants summary judgment on this claim and dismisses this claim with prejudice. If Imperial wishes to request attorney's fees under DTSA, Imperial may do so in the form of a Federal Rule of Civil Procedure 54(d) motion.

Signed July 22, 2025.

David C. Godbey
Chief United States District Judge